CAL-MAINE FOODS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 22144-84.      Filed August 8, 1989.

*Hugh C. Montgomery, Jr., Charles L. Brocato,* and *Gilbert C. Van Loon,* for the petitioner.

*Frank Simmons,* for the respondent.

HAMBLEN, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax for the fiscal year ended June 3, 1978, in the amount of $1,221,784.

After concessions by the parties, the issue for decision is whether for the fiscal year ended June 3, 1978, petitioner is entitled to use the cash receipts and disbursements method of accounting for its farm income from two of its subsidiary corporations, or whether that income must be reported on

the accrual method of accounting pursuant to section 447(a).[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner is a Delaware corporation which is authorized to do business in Mississippi and other States. During the fiscal year beginning May 29, 1977, and ended June 3, 1978, (hereinafter referred to as the fiscal year) and at the time of filing the petition in this case, petitioner's principal place of business was Jackson, Mississippi.

Petitioner filed a consolidated United States Corporation Income Tax Return (Form 1120) for the fiscal year. The results of operations of the following wholly-owned subsidiaries, all of whose fiscal years ended June 3, 1978, were included in this consolidated return: Cal-Maine Egg Products, Inc.; Cal-Maine Farms, Inc; Dairy Fresh Products Co.; Nationwide Distributing and Brokerage Co.; and D.F. Advertising, Inc. Petitioner had gross receipts of $376,509,206 for the fiscal year; it operated in fifteen States and 17 or 18 communities.

During the fiscal year, petitioner was a medium- to large-size farmer. It was the third or fourth largest egg producer in the United States.

Cal-Maine Farms, Inc. (hereinafter referred to as Farms) and Dairy Fresh Products Co. (hereinafter referred to as Dairy Fresh) are both poultry farmers. Their operations include all of the steps relating to the raising of chickens and laying flocks; the production of eggs; and the marketing, sale, and distribution of both shell eggs and processed eggs. During the fiscal year, Farms and Dairy Fresh operated their poultry farming business on a national basis.

For the fiscal year and several years before, petitioner used the accrual method of accounting for itself and all of its wholly-owned subsidiaries for all purposes, except that, for tax purposes only, petitioner used the cash basis method of accounting for Farms and Dairy Fresh. Farms and Dairy

---

[1]All section references are to the Internal Revenue Code of 1954 as amended and in effect for the year in issue unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided.

Fresh first began using the cash basis method of accounting in 1957. Most of petitioner's competitors in the egg farming business use the cash basis method of accounting.

During the fiscal year, petitioner was a publicly held corporation with approximately 1,300 stockholders.[2] Its stock was traded over the counter. For the fiscal year, petitioner's board of directors consisted of four "outside" directors and two "inside" directors. Fred Adams, Jr. (hereinafter referred to as Adams) was one of the two inside directors.

For the fiscal year and several years before, Adams was petitioner's president, chief executive officer, and principal shareholder. As of May 28, 1977, petitioner had common stock outstanding of 2,495,512 shares. Adams owned 1,338,904 shares of the common stock, or 53.7 percent. As of the end of the fiscal year, petitioner had common stock outstanding of 2,495,952 shares. Adams owned 1,288,786 shares of this common stock, or 51.6 percent. At all times during the fiscal year, Adams owned not less than 51.6 percent of petitioner's common stock.

As of October 11, 1976, petitioner had 40,000 shares of 5-percent cumulative preferred stock outstanding (hereinafter referred to as the preferred stock), which were convertible to common stock at the rate of 22 shares of common stock for one share of preferred stock.[3] The preferred stock was issued on March 29, 1972, under the authority of a "Certificate As To Resolution Adopted By Board of Directors" (hereinafter sometimes referred to as the preferred stock agreement). The preferred stock was callable after January 1, 1979, at par value plus accrued dividends. Beginning in 1980, petitioner was required to redeem

[2]Petitioner went from a public corporation to a private corporation in 1982.

[3]According to a "Certificate As To Resolution Adopted by Board of Directors" dated Mar. 29, 1972, pertaining to the issuance of the preferred stock, the holder of each share of the preferred stock had the right to convert on or after Jan. 1, 1974, any such share into fully paid and nonassessable shares of common stock at the rate of one share of common stock for each five dollars of either the par value or, in the event any dividends on the preferred stock had accrued and remained unpaid beyond the date of payment and subject to the rights of petitioner to pay the dividends, the redemption price per share of the preferred stock. Thus, initially each share of preferred stock was convertible into 20 shares of common stock. The record does not disclose why for the fiscal year, or after what date, the preferred stock was convertible at a rate of 22 shares of common stock for each share of preferred stock. Since the parties have stipulated that the conversion rate for the preferred stock for the fiscal year was 22 shares of common stock for each share of preferred stock and the record does not clearly contradict this stipulation, we accept the stipulation.

annually a minimum of 10,000 preferred shares if the preferred stock had not previously been converted into common stock.[4] As of October 14, 1976, DeKalb AgResearch, Inc. (hereinafter referred to as DeKalb) owned all of the outstanding preferred stock. DeKalb had acquired the preferred stock under a stock purchase agreement dated March 29, 1972.

The preferred stock agreement subjected petitioner to various limitations and requirements with regard to business activity and financial maintenance. There were stringent covenants which restricted petitioner's business activity. Default in the performance of any of the obligations and covenants for a period of 90 days or failure to pay three consecutive dividends when due enabled the holder of the preferred stock to accelerate redemption dates and to elect to the board of directors the smallest number of directors empowered to act on petitioner's behalf. The preferred stock agreement also limited payment of dividends on common stock. During 1978, DeKalb waived noncompliance with a financial maintenance requirement through June 1979.

Several months, and possibly as long as 1 year, before October 11, 1976, DeKalb asked petitioner to repurchase the preferred stock in advance of the time that petitioner was required to do so under the preferred stock agreement. The initial discussions between petitioner and DeKalb regarding the possible repurchase of the preferred stock continued for several months. Petitioner did not become interested in pursuing repurchase of the preferred stock until after the passage on October 4, 1976, of section 207(c) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, which added section 447 to the Internal Revenue Code.[5]

---

[4] The parties have stipulated that petitioner was required to begin to redeem the preferred stock in 1980. The copy of the preferred stock agreement presented to the Court, however, does not contain any such provision. We note though that a portion of the preferred stock agreement in the record wherein this provision logically could have been located may not have photocopied completely. The facts disclosed by the record do not clearly contradict the stipulation; therefore, we accept the stipulation.

[5] Sec. 207(c) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1538-1541, in pertinent part, reads as follows:

SEC. 207. LIMITATIONS ON DEDUCTIONS IN CASE OF FARMING SYNDICATES; CAPITALIZATION OF CERTAIN ORCHARD AND VINEYARD EXPENSES; AND METHOD OF ACCOUNTING FOR CORPORATIONS ENGAGED IN FARMING.

*    *    *    *    *    *    *

Section 447 generally requires corporations and certain partnerships engaged in the trade or business of farming to compute taxable income from farming on the accrual method of accounting unless certain exceptions apply. Sec.

---

(c) METHOD OF ACCOUNTING FOR CORPORATIONS ENGAGED IN FARMING.—

(1) GENERAL RULE.—

(A) Subpart A of part II of subchapter E of chapter 1 (relating to methods of accounting) is amended by adding at the end thereof the following new section:

"SEC. 447. METHOD OF ACCOUNTING FOR CORPORATIONS ENGAGED IN FARM-
ING.

"(a) GENERAL RULE.—Except as otherwise provided by law, the taxable income from farming of—

"(1) a corporation engaged in the trade or business of farming, or

"(2) a partnership engaged in the trade or business of farming, if a corporation is a partner in such partnership, shall be computed on an accrual method of accounting and with the capitalization of preproductive expenses described in subsection (b). This section shall not apply to the trade or business of operating a nursery or to the raising or harvesting of trees (other than fruit and nut trees).

　　　*　　　*　　　*　　　*　　　*　　　*　　　*

"(c) EXCEPTION FOR SMALL BUSINESS AND FAMILY CORPORATIONS.—For purposes of subsection (a), a corporation shall be treated as not being a corporation if it is—

"(1) an electing small business corporation (within the meaning of section 1371(b)),

"(2) a corporation of which at least 50 percent of the total combined voting power of all classes of stock entitled to vote, and at least 50 percent of the total number of shares of all other classes of stock of the corporation, are owned by members of the same family, or

"(3) a corporation the gross receipts of which meet the requirements of subsection (e).

"(d) MEMBERS OF THE SAME FAMILY.—For purposes of subsection (c)(2)—

"(1) the members of the same family are an individual, such individual's brothers and sisters, the brothers and sisters of such individual's parents and grandparents, the ancestors and lineal descendants or any of the foregoing, a spouse of any of the foregoing, and the estate of any of the foregoing,

"(2) stock owned, directly or indirectly, by or for a partnership or trust shall be treated as owned proportionately by its partners or beneficiaries, and

"(3) if 50 percent or more in value of the stock in a corporation (hereinafter in this paragraph referred to as 'first corporation') is owned, directly or through paragraph (2), by or for members of the same family, such members shall be considered as owning each class of stock in a second corporation (or a wholly owned subsidiary of such second corporation) owned, directly or indirectly, by or for the first corporation, in that proportion which the value of the stock in the first corporation which such members so own bears to the value of all the stock in the first corporation.

For purposes of paragraph (1), individuals related by the half blood or by legal adoption shall be treated as if they were related by the whole blood.

"(e) CORPORATIONS HAVING GROSS RECEIPTS OF $1,000,000 OR LESS.—A corporation meets the requirements of this subsection if, for each prior taxable year beginning after December 31, 1975, such corporation (and any predecessor corporation) did not have gross receipts exceeding $1,000,000. For purposes of the preceding sentence, all corporations which are members of a controlled group of corporations (within the meaning of section 1563(a)) shall be treated as one corporation.

　　　*　　　*　　　*　　　*　　　*　　　*　　　*

(2) EFFECTIVE DATE.—The amendments made by paragraph (1) shall apply to taxable years beginning after December 31, 1976.

　　　*　　　*　　　*　　　*　　　*　　　*　　　*

Sec. 207(c)(2) of the Tax Reform Act of 1976 was amended effective generally for taxable years beginning after December 31, 1976, by sec. 404 of the Tax Reduction and Simplification Act of 1977, Pub. L. 95-30, 91 Stat. 126, 155-156, as follows:

447(a); 447(c) (now sec. 447(d), see note 13 *infra).* After the enactment of section 447, petitioner made some calculations of stock ownership and determined that, in order for Farms and Dairy Fresh to continue using the cash basis method of accounting, petitioner would have to make changes in voting stock ownership so as to satisfy the "family corporation" exception to section 447(a) contained in section 447(c) (now sec. 447(d)).

A specially called meeting of petitioner's board of directors was held on October 11, 1976, for the purpose of reviewing the effects on petitioner of the Tax Reform Act of 1976. At this meeting, Adams and petitioner's management proposed to the board of directors several alternatives which they believed would allow petitioner to meet the

---

SEC. 404. POSTPONEMENT OF EFFECTIVE DATE OF CHANGES MADE BY THE TAX REFORM ACT OF 1976 IN THE METHOD OF ACCOUNTING FOR CERTAIN CORPORATIONS ENGAGED IN FARMING.

Section 207(c)(2) of the Tax Reform Act of 1976 is amended to read as follows:

"(2) EFFECTIVE DATES.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), the amendments made by paragraph (1) shall apply to taxable years beginning after December 31, 1976.

"(B) SPECIAL RULE FOR CERTAIN CORPORATIONS.—In the case of a corporation engaged in the trade or business of farming and with respect to which—

"(i) members of two families (within the meaning of paragraph (1) of section 447(d) of the Internal Revenue Code of 1954, as added by paragraph (1)) owned, on October 4, 1976 (directly or through the application of such section 447(d)), at least 65 percent of the total combined voting power of all classes of stock of such corporation entitled to vote, and at least 65 percent of the total number of shares of all other classes of stock of such corporation; or

"(ii) members of three families (within the meaning of paragraph (1) of such section 447(d)) owned, on October 4, 1976 (directly or through the application of such section 447(d)), at least 50 percent of the total combined voting power of all classes of stock of such corporation entitled to vote, and at least 50 percent of the total number of shares of all other classes of stock of such corporation; and substantially all of the stock of such corporation which was not so owned (directly or through the application of such section 447(d)), by members of such three families was owned, on October 4, 1976, directly—

"(I) by employees of the corporation or members of the families (within the meaning of section 267(c)(4) of such Code) of such employees, or

"(II) by a trust for the benefit of the employees of such corporation which is described in section 401(a) of such Code and which is exempt from taxation under section 501(a) of such Code.the amendments made by paragraph (1) shall apply to taxable years beginning after December 31, 1977."

[See notes 9, 11, and 12, *infra*, for the subsequent amendments to sec. 447 made by secs. 351 and 353 of the Revenue Act of 1978 (Pub. L. 95-600, 92 Stat. 2763, 2846-2847) and sec. 10205 of the Omnibus Budget Reconciliation Act of 1987 (Pub. L. 100-203, 101 Stat. 1330, 1395-1397). Subsequent amendments to sec. 447 made by sec. 701(l) of the Revenue Act of 1978, sec. 230 of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub. L. 97-248, 96 Stat. 324, 495-496), secs. 5(a) 28 and 29 of the Subchapter S Revision Act of 1982 (Pub. L. 97-354, 96 Stat. 1669, 1695), sec. 803(b)(7) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2356), and sec. 1008(b)(6) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3438) do not affect the instant case and are not set forth herein.]

"family corporation" exception. Two of the alternatives discussed were: (1) Petitioner would repurchase all of the preferred stock held by DeKalb; or (2) Adams, individually, would buy approximately one-half of the preferred stock held by DeKalb if petitioner would loan Adams the money with which to make the purchase.

The minutes of the specially called meeting of the board of directors held on October 11, 1976, describe the events at this meeting in part as follows:

After full discussion as to the impact on the Corporation of the new tax act, the funds available for such purchase, and the current general financial position and prospects of the Corporation, the Directors were of the opinion that it would be in the best interest of the Corporation and its shareholders to enter into an agreement with DeKalb AgResearch, Inc. under the terms of which the Corporation or its assignee would have the right to acquire preferred stock of the Corporation held by DeKalb. On motion by Mr. Davis, seconded by Mr. McMullan, the following resolution was unanimously adopted:

RESOLVED, that the Corporation shall be and is hereby authorized to enter into an agreement with DeKalb AgResearch, Inc., under the terms of which the Corporation, or its assignees, Fred Adams, Jr. or the Cal-Maine Foods, Inc. Employee Stock Ownership Plan, shall be obligated to purchase 10,000 shares of its preferred stock from DeKalb AgResearch, Inc., at a purchase price of $1,100,000, plus accrued but unpaid dividends, with said agreement further providing that Cal-Maine shall have an option to acquire the balance of such stock held by DeKalb in blocks of 5,000 shares, at a price of $110 per share for all stock purchased prior to January 1, 1979, and thereafter at a price of $120 per share.

BE IT FURTHER RESOLVED that the President of the Corporation shall be and is hereby authorized to negotiate and enter into an agreement with DeKalb as generally set forth above, containing such other rights and obligations as the President shall deem appropriate and reasonable under the circumstances.

The board of directors elected to loan Adams the money so that he could buy the appropriate amount of the preferred stock. There was an immediate cash-flow advantage to petitioner for Adams', as opposed to petitioner itself, purchasing the preferred stock. If petitioner were the purchaser, it would have to purchase approximately twice as many shares for petitioner to meet the "family corporation" exception.

Further, because the preferred stock agreement subjected petitioner to various limitations and requirements with

regard to business activity and financial maintenance, see *supra*, it was to petitioner's advantage for Adams, a more interested and tolerant shareholder, to own the preferred stock than for DeKalb to continue to own it.

Petitioner prepared a schedule showing the then owner-ship of common stock of Adams and his family and the number of preferred shares (with voting rights of 22 votes per share) Adams would have to purchase commencing October 14, 1976, in order for petitioner to meet the "family corporation" exception. This schedule projects Adams pur-chasing a total of 15,000 shares of preferred stock before the beginning of the year ended May 30, 1978 (which as projected would give Adams control of 50.1 percent of all of the voting stock of petitioner) and the remaining shares of the preferred stock owned by DeKalb as being redeemed directly by petitioner by August 31, 1979. The schedule does not project petitioner redeeming any preferred stock from Adams.

On October 13, 1976, petitioner made a loan to Adams of $1,100,000, for which Adams gave petitioner a 7-percent demand note.

On October 14, 1976, the following events occurred:

(1) Petitioner agreed to purchase 10,000 shares of its outstanding preferred stock from DeKalb for $1,100,000.[6]

---

[6]The agreement between petitioner and DeKalb dated Oct. 14, 1976, provided in pertinent part as follows:

1. *Sale of Preferred Stock.* At the date hereof DEKALB will sell, assign and transfer to Cal-Maine 10,000 shares of the Preferred Stock. In consideration therefor Cal-Maine will deliver to DEKALB on this date a bank check representing current funds in Chicago in the aggregate amount of $1,100,000 plus accrued but unpaid dividends to the date hereof on such 10,000 shares of Preferred Stock.

2. *Future Purchases.* DEKALB further grants Cal-Maine an option to purchase 5,000 shares of Preferred Stock at each of February 28, 1977, August 31, 1977, February 28, 1978, August 31, 1978, February 28, 1979 and August 31, 1979, each such date being hereinafter referred to as an "Option Date". The price for each share of such Preferred Stock purchased prior to January 1, 1979 shall be $110.00 plus accrued dividends to date, and thereafter the price shall be $120.00 per share plus accrued dividends to date, to be paid in each case in the same manner as prescribed in paragraph 1 of this Agreement. [Amended Jan. 15, 1979.]

\*　　\*　　\*　　\*　　\*　　\*　　\*

5. *Accelerated Purchase.* Cal-Maine shall be entitled to purchase from DEKALB at any time during the term of this Agreement shares of the Preferred Stock at the price and in the manner prescribed in paragraph 2. Any purchase of Preferred Stock by Cal-Maine or its Assignee pursuant to this paragraph shall be credited and applied against Cal-Maine's next options to purchase on specified dates as set forth in paragraph 2. Other than to modify the number of shares which Cal-Maine is otherwise obligated to purchase upon the exercise of any option, any accelerated purchase pursuant to this paragraph shall not relieve DEKALB or

(2) DeKalb granted to petitioner an option to purchase at $110 per share 5,000 shares of the preferred stock on each of the dates February 28, 1977; August 31, 1977; February 28, 1978; August 31, 1978; February 28, 1979; and August 31, 1979.[7]

Cal-Maine of their obligations under this Agreement. Cal-Maine shall give DEKALB five days written notice of its intention to exercise any purchase right provided in this paragraph.

6. *Right of First Refusal.* After January 1, 1979, DEKALB may sell to third parties the Preferred Stock or common stock obtained on conversion of the Preferred Stock. Such right of sale shall be exercised only in the event DEKALB shall have a bona fide purchaser for such stock. In the event of such desired sale, DEKALB shall give Cal-Maine ten days oral or telegraphic notice, confirmed in writing, of the terms and conditions of the proposed sale, including the identity of the purchaser. Cal-Maine shall thereupon have the right, for a period of five days following the time DEKALB has a bona fide offer to purchase at the same price and on the same terms of such offer. Cal-Maine must exercise its right within such five day period. If Cal-Maine does not exercise such right of first refusal with respect to shares proposed to be sold and DEKALB does not sell such shares on the terms stated to Cal-Maine within thirty days following the giving of DEKALB's notice to Cal-Maine, such shares shall again become subject to the rights of Cal-Maine under this paragraph. [Deleted Jan. 15, 1979.]

7. *Continuing Obligations of Cal-Maine.* Except as provided in this paragraph 7, the provisions of this Agreement do not detract from the rights, privileges, obligations and duties of Cal-Maine as issuer or DEKALB as holder of the Preferred Stock as specified in the Certificate of Incorporation, as amended, of Cal-Maine, the Certificate of Designation, as amended, creating this Preferred Stock filed with the Secretary of State of Delaware March 30, 1972, or the Series A Stock Purchase Agreement dated March 29, 1972, between DEKALB and Cal-Maine pursuant to which DEKALB purchased the Preferred Stock. DEKALB agrees that for purposes of the limitations and obligations of Cal-Maine contained in Section 10 of the Certificate of Designation, all computations shall be made as if Cal-Maine or its Assignee had not purchased any shares of the Preferred Stock and as if the price of such Preferred Stock were added to Cal-Maine's available cash. Further, DEKALB consents to the loan of funds by Cal-Maine to the Assignees or the guaranty by Cal-Maine of a loan to the Assignees, but only if such loans or guaranty are otherwise properly authorized and are used solely to purchase preferred stock pursuant hereto. Such loan shall be collateralized by a pledge of all stock purchased with the proceeds thereof. Cal-Maine agrees that if it purchases any Preferred Stock pursuant to this Agreement after December 31, 1977, Cal-Maine will not exercise any optional redemption rights under Section 3 of such Certificate of Designation prior to January 1, 1980.

8. *Restrictions on Transfer.* Other than sales to Fred Adams, Jr. or the Cal-Maine Foods, Inc. Employee Stock Ownership Plan, Cal-Maine agrees not to sell any shares of the Preferred Stock of Cal-Maine purchased by it hereunder without the prior written approval of DEKALB, prior to such time as Cal-Maine shall have purchased all of the outstanding shares of the Preferred Stock pursuant to the Agreement or such shares of Preferred Stock shall otherwise be retired. Any such sale to an Assignee shall be subject to an agreement by purchaser that the shares thereby acquired will not be resold or otherwise transferred as Preferred Stock by such purchaser; provided, however, any stock purchased as aforesaid may be transferred as Preferred Stock from the purchaser to Cal-Maine. * * * [Amended Jan. 15, 1979.]

9. *Assignment.* The right of Cal-Maine to purchase shares hereunder may not be assigned; provided, however, that Cal-Maine may assign such right to purchase shares on any date to the Cal-Maine Employees Stock Ownership Plan or to Fred Adams, Jr. (the "Assignee") for purchases on its own behalf. Any such purchase by either of the Assignees shall be made at the same price and in the same manner as provided herein for purchases by Cal-Maine and shall not relieve Cal-Maine of any of its obligations hereunder (other than the obligations to purchase the specific shares actually purchased by the Assignees) nor or [sic] any of the consequences of its failure to exercise any option hereunder.

[7]This option was amended on Jan. 15, 1979, to allow purchases of 5,000 shares on each of Feb. 28, 1977, Aug. 31, 1977, Feb. 28, 1978, and Aug. 31, 1978, at $110 per share. Thereafter, during each 3-month period from January 15, 1979, through June 15, 1981, petitioner or its

(3) Petitioner assigned its right to purchase the 10,000 shares of preferred stock to Adams.

(4) Adams purchased the 10,000 shares of preferred stock from DeKalb with the $1,100,000 he had borrowed from petitioner on October 13, 1976.

(5) Petitioner assigned to Adams its option to purchase 5,000 shares of preferred stock on February 28, 1977, and 5,000 shares on August 31, 1977.

Petitioner recorded the $1,100,000 loan to Adams on October 13, 1976, in its books and records in the account "Notes Receivable Officers and Stockholders." Adams entered the transactions in his personal books of account as a "stock purchase" and a loan from petitioner.

On January 26, 1977, Adams exercised a portion of his assigned option and purchased 5,000 shares of the preferred stock from DeKalb by issuing his personal check for $550,000. Petitioner made a loan to Adams of $550,000 on January 29, 1977, to cover Adams' check issued to DeKalb. Adams gave petitioner a 7-percent demand note for the loan. Petitioner recorded the $550,000 loan to Adams in its account "Notes Receivable Officers and Stockholders." Adams entered the transactions in his personal books of account as a "stock purchase" and a loan from petitioner.

On May 19, 1977, petitioner made a loan to Adams of $550,000, for which Adams gave petitioner a 7-percent demand note. Petitioner recorded the $550,000 loan to Adams in its account "Notes Receivable Officers and Stockholders." Adams used the $550,000 to purchase an additional 5,000 shares of preferred stock from DeKalb. Adams entered the transactions in his personal books of account as a "stock purchase" and a loan from petitioner.

The three loans to Adams, totaling $2,200,000, which he used to purchase 20,000 shares of preferred stock from DeKalb were reflected in the June 3, 1978, classified trial balance of petitioner as "Notes Rec. Off. & Stkhldrs. $2,200,000."

The stock certificates representing the 20,000 shares of preferred stock Adams purchased from DeKalb were reissued in Adams' name alone. During the entire fiscal year,

assignee could acquire 1,000 additional shares at prices ranging from $120 to approximately $134 per share.

petitioner had the 20,000 shares of preferred stock in its possession as collateral for its loans to Adams.

At all times during the fiscal year, the 20,000 shares of the preferred stock purchased by Adams from DeKalb represented 50 percent or more of the issued and outstanding preferred stock.

At the time Adams purchased the preferred stock from DeKalb and through the fiscal year, petitioner and Adams had not entered into any binding agreement requiring petitioner to redeem the preferred stock from Adams nor had they entered into any agreement as to when the loans would be repaid. Adams was free to convert any or all of the preferred stock into common stock of petitioner at the rate of 22 shares of common stock for each share of preferred stock. Petitioner, however, was required to redeem annually a minimum of 10,000 shares of the unconverted preferred stock beginning in 1980 pursuant to the preferred stock agreement, see *supra.* At the time he purchased the stock, Adams was aware of the mandatory redemption requirement.

On or about January 23, 1979, all of petitioner's directors executed consents authorizing petitioner to purchase from Adams 10,000 shares of the preferred stock for the price of $120 per share. Thereafter, on January 29, 1979, petitioner redeemed the 10,000 shares from Adams for $1,200,000, and Adams repaid the October 13, 1976, loan to petitioner in the amount of $1,100,000. Adams recorded repayment of the loan to petitioner in his cash journal as a debit to "Note Payment" and a credit to "Bank Account." Adams and his wife reported the redemption of the 10,000 shares of the preferred stock on their 1979 joint Federal income tax return as a $100,000 capital gain and a $1,100,000 recovery of cost.

When petitioner redeemed the 10,000 shares of the preferred stock from Adams on January 29, 1979, Adams did not have $1,100,000 cash in his bank account. At that time, Adams' net worth was approximately $7,000,000, with his principal asset being his holdings of common stock and the preferred stock of petitioner. Adams could have repaid the $1,100,000 loan to petitioner without petitioner redeeming the preferred stock.

During the fiscal year ended May 31, 1980, Adams converted 1,900 shares of the preferred stock into 41,800 shares of common stock (at a rate of 22 shares of common stock for each share of preferred stock). Adams reported the conversions to the Securities and Exchange Commission on its Forms 4 for the months December 1979 and June 1980.

On February 24, 1981, Adams repaid the January 29, 1977, and May 19, 1977, loans of $550,000 each by executing a new 7-percent demand note for $136,211.06 and transferring to petitioner a note receivable due to Adams in the amount of $963,788.94 The latter note receivable was paid to petitioner before May 28, 1982.

Petitioner redeemed 1,000 shares of the preferred stock from Adams on April 13, 1981, for $132,538.33. Adams and his wife reported a gain of $22,538 from this redemption on their 1981 joint Federal income tax return. Also on April 13, 1981, Adams repaid the February 24, 1981, loan of $136,211.06 by this redemption of the 1,000 shares of the preferred stock plus his personal check for $3,672.73. At all times from and after April 13, 1981, through the date of trial, Adams owned 7,100 shares of the preferred stock.

Petitioner paid a 5-percent dividend to Adams on the 20,000 shares of the preferred stock in 1977, 1978, and 1979. Adams reported the dividends on his Federal income tax returns for those years.

Adams paid interest on the loans of $2,200,000 to petitioner at the rate of 7-percent. Adams deducted interest expense to petitioner of $136,726 and $25,000, respectively, on Schedule A of the joint Federal income tax returns he and his wife filed for 1979 and 1981. The record does not reveal whether Adams paid petitioner interest in 1977, 1978, or 1980 or whether he deducted interest paid to petitioner on his Federal income tax returns for those years.

After Adams purchased 20,000 shares of the preferred stock from DeKalb in 1976 and 1977, DeKalb still owned 20,000 shares of the preferred stock. Petitioner subsequently redeemed the remaining preferred stock from DeKalb as follows:

| Date | *Shares redeemed* |
|---|---|
| Feb. 28, 1978 | 5,000 |
| Aug. 31, 1978 | 5,000 |
| Mar. 14, 1979 | 1,000 |
| June 15, 1979 | 1,000 |
| June 1980 | 2,000 |
| May 30, 1981 | 6,000 |
| Total | 20,000 |

In the statutory notice issued to petitioner for the fiscal year, respondent determined, among other things, that the cash receipts and disbursements method of accounting used by Farms and Dairy Fresh for that year does not clearly reflect income, but that the accrual method of accounting does clearly reflect income for the fiscal year. Therefore, respondent recomputed petitioner's taxable income for the fiscal year using the accrual method of accounting for Farms and Dairy Fresh. Due to the change in the method of accounting, respondent made adjustments to petitioner's tax return for the fiscal year required by section 481.

The parties agree that should this Court determine that Farms and Dairy Fresh are required to change their method of accounting from the cash basis method to the accrual method beginning with the fiscal year, petitioner will be entitled, pursuant to section 447(f)(3), to spread the adjustment required by section 481(a) over a 10-year period beginning with the year of change.

## ULTIMATE FINDINGS OF FACT

(1) Adams, not petitioner, purchased the preferred stock in question from DeKalb.

(2) For the fiscal year, Adams owned the preferred stock in question which he had purchased from DeKalb.

(3) During the fiscal year, petitioner was a corporation of which at least 50 percent of the total combined voting power of all classes of stock entitled to vote, and at least 50 percent of the total number of shares of all other classes of stock of the corporation were owned by members of the same family.

OPINION

A. PRELIMINARY MATTERS

1. *Evidentiary issues*

At the trial, respondent raised objections on relevancy grounds to three documents offered by petitioner. We admitted the documents subject to those objections.

Petitioner's exhibit 23 is a copy of a computation showing the then percentage of ownership of the shares of common stock of petitioner, assuming conversion of all the preferred stock to common stock, that DeKalb and Adams or members of his family owned and further computations at specified future dates commencing as of October 14, 1976, and through August 31, 1979, of the percentage of ownership of the shares of common stock, assuming conversion, that DeKalb and Adams or members of his family would own assuming Adams or his family members had purchased a specified number of shares of preferred stock from DeKalb on or before the specified dates.

Petitioner's exhibit 24 is a copy of the agreement dated October 14, 1976, between petitioner and DeKalb pertaining to the purchase of the preferred stock from DeKalb by petitioner or its assignee and the grant of options by DeKalb for additional purchases of the preferred stock.

Petitioner's exhibit 25 is an amendment effective as of January 15, 1979, to the October 14, 1976, agreement between petitioner and DeKalb described immediately above.

The rules of evidence applicable to Tax Court proceedings are the rules applicable in trials without jury in the U.S. District Court for the District of Columbia. These include the Federal Rules of Evidence (hereinafter referred to as FRE). See sec. 7453; Rule 143(a), Tax Court Rules of Practice and Procedure; *Vallone v. Commissioner,* 88 T.C. 794, 796 n. 3 (1987).

FRE 402 provides that "All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." FRE 401 defines "relevant evidence" as "evi-

dence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

All three documents to which respondent objects pertain to matters which are in issue in the case; they tend to prove or disprove the existence of facts that are of consequence to the disposition of this case. The documents are relevant; therefore, we hold that they are admissible.

## 2. *Request to correct stipulation*

After the trial in the instant case, petitioner filed a motion to correct the stipulation of facts filed with the Court at the trial of the case. Petitioner asserted that stipulation No. 14 does not accurately summarize exhibit 2-B, which is a part of the stipulation and which is a director's consent to certain corporate action.[8] Respondent objected to petitioner's motion on the grounds that the motion was not timely and that petitioner should be bound by a stipulation which he agreed to after review and without objection.

In a memorandum sur order filed July 29, 1987, after a review of the stipulation paragraph and exhibits 2-B and 3-C, we concluded that there is a variance and disparity between the language of stipulation No. 14 and the contents of exhibit 2-B and exhibit 3-C resulting in a patent ambiguity which must be resolved by the Court. We further concluded that the appropriate time to resolve the ambiguity is when we review the entire record and make our findings of fact and render our opinion.

We may disregard stipulations between parties where justice requires it if the evidence contrary to the stipulation is substantial or the stipulation is clearly contrary to facts disclosed by the record. See *Loftin and Woodard, Inc. v. United States,* 577 F.2d 1206, 1232 (5th Cir. 1978); *Jasionowski v. Commissioner,* 66 T.C. 312, 317-318 (1976). The facts disclosed by the record here show that stipulation

---

[8]Par. 14 of the stipulation of facts states:

"14. Exhibit 2-B is a copy of document entitled 'Consent of Director,' dated January 23, 1979, authorizing the corporation to re-acquire its preferred stock from DeKalb, the assignment of this right to Adams, and authorizing the corporation to acquire a portion of the preferred stock from Adams."

No. 14 clearly misstates the text of exhibit 2-B and the authorization granted by petitioner's board of directors in January 1979 pertaining to the preferred stock as described in the director's consent. Consequently, we refuse to be bound by stipulation No. 14. Our findings as to the actions of petitioner's board of directors in October 1976 and January 1979 pertaining to the preferred stock are set forth in the findings of fact, *supra.*

## B. SUBSTANTIVE MATTERS

Taxpayers are required to use a method of accounting for tax purposes which clearly reflects income. Sec. 446. Most taxpayers who are in the business of selling nonfarm products are required to report gross income using an accrual method of accounting and to accumulate their production costs in inventory until the products are sold. Sec. 1.446-1, Income Tax Regs.

Before the enactment of section 447, by reason of administrative rulings issued more than 50 years before, any taxpayer engaged in the trade or business of farming could use the cash basis method of accounting for that business and deduct currently costs of a nature which, for other businesses, would be either included in inventory or capitalized. Section 447 generally requires that farming corporations and certain farming partnerships in which "nonexcepted" corporations are partners use an accrual method of accounting and capitalize preproductive period expenses. Exceptions to section 447 as enacted in 1976 and amended in 1978 were provided for S corporations, family corporations (as defined in section 447(c), now sec. 447(d)), corporations with annual gross receipts of $1,000,000 or less, and taxpayers in the trade or business of operating a nursery or sod farm or the business of forestry or the raising or harvesting of trees (other than fruit or nut trees). Sec. 447(a), as amended by sec. 353(a) of the Revenue Act of 1978, Pub. L. 95-600, 92 Stat. 2763, 2847.[9]

---

[9]Sec. 353 of the Revenue Act of 1978 provides as follows:

SEC. 353. TREATMENT OF CERTAIN FARMS FOR PURPOSES OF RULE REQUIRING ACCRUAL ACCOUNTING.

(a) GENERAL RULE.—Section 447 (relating to method of accounting for corporations engaged in farming) is amended by striking out "nursery" in subsection (a) thereof and adding in lieu thereof "nursery or sod farm".

Petitioner asserts that for the fiscal year it met the requirements of the "family corporation" exception to section 447(a). See sec. 447(c), now sec. 447(d). Respondent does not challenge Farms' and Dairy Fresh's status as farmers. However, relying on the "step transaction doctrine," respondent contends that Adams did not own the preferred stock purchased from DeKalb; rather, according to respondent, Adams was merely a conduit for petitioner, the actual purchaser of the stock from DeKalb. Therefore, respondent argues, for the fiscal year Adams did not own the requisite percentage of voting stock needed for petitioner to satisfy the "family corporation" exception to section 447(a). For the following reasons, we agree with petitioner.

1. *Step transaction doctrine*

The threshold issue in determining whether petitioner meets the "family corporation" exception to section 447(a) is whether Adams' purchase of the preferred stock from DeKalb is to be treated for tax purposes as an independent transaction of sale, or as a transitory step in the redemption by petitioner of the preferred stock from DeKalb.

In general, the "incidence of taxation depends upon the substance of a transaction" rather than its mere form. *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945). A taxpayer has the right to minimize taxes as far as the law allows. *United States v. Cumberland Pub. Serv. Co.*, 338 U.S. 451, 455 (1950); *Gregory v. Helvering*, 293 U.S. 465, 469 (1935). Nonetheless, a taxpayer ordinarily may not through form alone achieve tax advantages which substantively are without the intent of the statute. *Commissioner v. Court Holding Co., supra; Gregory v. Commissioner, supra.* Taxation is not so much concerned with refinements of title as it is with actual command over the property. *Corliss v. Bowers*, 281 U.S. 376, 378 (1930); *Palmer v. Commissioner*, 62 T.C. 684, 691-692 (1974), affd. 523 F.2d 1308 (8th Cir. 1975).

The Supreme Court has stated that "A given result at the end of a straight path is not made a different result

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to taxable years beginning after December 31, 1976.

because reached by following a devious path." *Minnesota Tea Co. v. Helvering,* 302 U.S. 609, 613 (1938). Accordingly, where a taxpayer has embarked on a series of transactions that are in substance a single, unitary, or indivisible transaction, the courts have disregarded the intermediary steps and have given credence only to the completed transaction. See *Redwing Carriers, Inc. v. Tomlinson,* 399 F.2d 652, 654 (5th Cir. 1968); *Kuper v. Commissioner,* 61 T.C. 624 (1974), affd. in part, revd. in part 533 F.2d 152 (5th Cir. 1976). The essence of this "step transaction doctrine" is that "an 'integrated transaction must not be broken into independent steps or, conversely, that the separate steps must be taken together in attaching tax consequences.' " *King Enterprises, Inc. v. United States,* 189 Ct. Cl. 466, 474, 418 F.2d 511, 516 (1969).

Whether a series of transfers resulting in a sale constitute for tax purposes one or several transactions is a question of fact. *United States v. Cumberland Pub. Serv. Co., supra; Commissioner v. Court Holding Co., supra.* In deciding the question, each step, from the commencement of negotiations to the consummation of the sale, is relevant. *Estate of Schneider v. Commissioner,* 88 T.C. 906, 939 (1987), affd. 855 F.2d 435 (7th Cir. 1988).

There is no universal test applicable to step transaction situations. It has been suggested that " 'the aphorisms about 'closely related steps' and 'integrated transactions' may have different meanings in different contexts, and that there may be not one rule, but several, depending on the substantive provision of the Code to which they are being applied.' " *King Enterprises, Inc. v. United States, supra* at 516.

Courts have applied three alternative tests to determine whether to apply the step transaction. Under the "binding commitment" test, a series of transactions is collapsed if, at the time the first step is entered into, there was a binding commitment to undertake the later step. *Penrod v. Commissioner,* 88 T.C. 1415, 1429 (1987). See *Commissioner v. Gordon,* 391 U.S. 83, 96 (1968); *Ward v. Commissioner,* 29 B.T.A. 1251 (1934). One court has suggested that the binding commitment test is only applicable where a substantial period of time has passed between the steps that

are subject to scrutiny. *Redding v. Commissioner,* 630 F.2d 1169, 1175 (7th Cir. 1980), revg. 71 T.C. 597 (1979), cert. denied 450 U.S. 913 (1981). "Clearly, the step transaction doctrine would be a dead letter if restricted to situations where the parties were *bound* to take certain steps." *King Enterprises, Inc. v. United States,* 418 F.2d at 518 (emphasis in original). The Fifth Circuit, the court to which an appeal of this case would lie, has determined that the "binding commitment" test should be strictly limited to the facts of *Commissioner v. Gordon, supra* (a series of transactions occurring over more than 1 year involving distributions under sec. 355). *Security Industrial Ins. Co. v. United States,* 702 F.2d 1234, 1245 (5th Cir. 1983).

The "interdependence test" requires an inquiry as to " 'whether on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series.' " *King Enterprises, Inc. v. United States,* 418 F.2d at 516. See *American Bantam Car Co. v. Commissioner,* 11 T.C. 397 (1948), affd. 177 F.2d 513 (3d Cir. 1949). "When 'it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts,' *Kuper [v. Commissioner],* 533 F.2d [152] at 156 [(5th Cir. 1976), affg. in part and revg. in part 61 T.C. 624 (1974)], step transaction treatment may be deemed appropriate." *Security Industrial Ins. Co. v. United States, supra.*

Under the "end result" test, the step transaction doctrine will be invoked if it appears that a series of formally separate steps are really prearranged parts of a single transaction intended from the outset to reach the ultimate result. *Penrod v. Commissioner, supra; King Enterprises, Inc. v. United States, supra.* The Fifth Circuit has noted that when cases involve "a series of transactions *designed and executed as parts of a unitary plan to achieve an intended result,*" the transactions will be viewed as a whole "regardless of whether the effect of doing so is imposition of or relief from taxation." *Kanawha Gas & Utilities Co. v. Commissioner,* 214 F.2d 685, 691 (5th Cir. 1954) (emphasis added), revg. 19 T.C. 1017 (1953).

First, it is necessary for us to clarify to which purchase or purchases we apply our analysis of the step transaction doctrine. Respondent has invited us to consider only Adams' purchase of the first 10,000 shares of the preferred stock from DeKalb. We agree with petitioner that it is inappropriate to focus only on the first 10,000 shares as respondent would have us do. Adams' purchase of only 10,000 shares would not have achieved the admitted goal of having petitioner meet the "family corporation" exception to section 447(a). It cannot be disputed that, from the very beginning, the plan was for Adams to purchase between 15,000 and 20,000 shares of the preferred stock. Therefore, we will apply our step transaction analysis to all three purchases of the preferred stock.

In *Security Industrial Ins. Co. v. Commissioner, supra,* the Fifth Circuit determined that "both the 'end result' test and the 'interdependence' test are helpful in analyzing multiphase transactions in terms of the step transaction doctrine." We need not determine here whether both tests must be applied in all cases since, viewing the facts of the instant case in light of the step-transaction doctrine, we are not persuaded that the doctrine is applicable under any of the three tests.

Adams purchased 10,000 shares of the preferred stock from DeKalb on October 14, 1976. He purchased an additional 5,000 shares of preferred stock on each of January 26, 1977, and May 19, 1977. Petitioner did not redeem any shares of the preferred stock from Adams until January 29, 1979, more than 2 years after the date on which Adams first purchased preferred stock from DeKalb. Adams was free to convert any or all of the preferred stock into common stock, as he did in 1980 to the extent of 1,900 shares. Moreover, at the time of trial, more than 10 years from the time Adams first purchased preferred stock from DeKalb, he still owned 7,100 shares of the preferred stock. According to Adams' uncontroverted testimony, at the time he purchased the preferred stock from DeKalb, there was no binding commitment between Adams and petitioner requiring petitioner to redeem the preferred stock from him. We find Adams to be a credible witness and believe he testified truthfully. On these facts, we find that the "binding

commitment" test does not require application of the step transaction doctrine to these transactions.

As for the "end result" test, we are persuaded that at the time Adams agreed to purchase the preferred stock, petitioner and Adams had not intended for the end result of the transaction to be petitioner's redemption of the preferred stock from Adams. Adams testified, and we believe, that at the time he purchased the preferred stock from DeKalb, there was no agreement with petitioner that it would redeem the preferred stock from him, although he was aware of the mandatory redemption provisions in the preferred stock agreement.

The fact that Adams borrowed the funds from petitioner to purchase the preferred stock from DeKalb and later repaid some of the loans with the proceeds of the subsequent redemptions by petitioner might conceivably cast some shadow over the transactions. However, we do not find this sufficient in itself to collapse the transactions, especially on the record before us. Adams enjoyed the benefits and burdens of ownership of the preferred stock. He converted some of the shares to common stock; he received dividends on the stock; he reported gain on the redemptions; and he paid interest to petitioner on the loans made to enable him to purchase the stock. Adams also used some of his own funds or personal assets to repay some of the loans. Therefore, we find that he was the true owner of this stock. Cf. *Houchins v. Commissioner,* 79 T.C. 570, 590-591 (1982); *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237-1238 (1981).

Moreover, the fact that petitioner's common stock was publicly traded, a substantial number of shares of the common stock were held by minority shareholders, and "outside" directors outnumbered "inside" directors by two-to-one, further confirms that Adams' purchase of the preferred stock was bona fide. For the fiscal year approximately 1,300 stockholders held petitioner's common stock and the board of directors consisted of four "outside" directors and two "inside" directors (including Adams). In view of the substantial publicly held minority holdings, the "outside" directors would have been remiss, and would have exposed themselves to adverse consequences, had they not

acted prudently in determining which alternative was in petitioner's best interest. To the extent that the DeKalb agreement presented opportunities more favorable to the corporation's purchasing the preferred stock as opposed to Adams, the directors, and especially Adams, would appear to have violated the "corporate opportunity" doctrine[10] by permitting Adams to purchase the stock. Although, generally a corporation has no interest in its outstanding stock, or in dealings by its officers, directors, or shareholders regarding the stock, a corporate director or officer may not usurp a business opportunity pertaining to that stock if that opportunity is essential to the corporation, or the corporation has an interest or expectancy in it, or corporate resources are wrongfully embarked on the purchase of the stock by the director, officer, or shareholder. See *Pioneer Oil & Gas Co. v. Anderson,* 168 Miss. 334, 151 So. 161, 163-164 (1933); *Kaplan v. Fenton,* 278 A.2d 834, 836 (Del. 1971); *Vulcanized Rubber & Plastics Co. v. Scheckter,* 400 Pa. 405, 162 A.2d 400 (1960); *Northwestern Terra Cotta Corp. v. Wilson,* 74 Ill. App. 2d 38, 219 N.E.2d 860, 864 (1966). Thus, had it been more advantageous to petitioner for it to redeem the preferred stock from DeKalb, the directors would have exposed themselves to liability for breach of their fiduciary duties by permitting Adams to purchase those shares. We are convinced from the record here that the directors took the approach most beneficial to the corporation.

On the basis of the record as a whole, we find that Adams' purchase of the preferred stock from DeKalb, and petitioner's subsequent redemption of the preferred stock from Adams, were not parts of a unitary plan for petitioner to acquire the preferred stock from DeKalb. Accordingly, the "end result" test does not support application of the step transaction doctrine to the facts before us.

Applying the interdependence test, we find that Adams' purchase of the preferred stock would not have been

---

[10]Under the "corporate opportunity" doctrine, "one who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence." 3 W. Fletcher, Cyclopedia of Corporations, sec. 861.1, p. 282 (1986 rev. ed.). See *Farber v. Servan Land Co.,* 662 F.2d 371, 377 (5th Cir. 1981); *Dasho v. Susquehanna Corp.,* 380 F.2d 262, 269-270 (7th Cir. 1967); *S.E.C. v. Insurance Securities,* 254 F.2d 642, 649-650 (9th Cir. 1958).

fruitless without petitioner's subsequent redemption of those shares. As a result of that purchase, Adams and his family obtained control over more than 50 percent of the voting stock of petitioner and petitioner then met the "family corporation" exception. Therefore, Adams' purchase of the preferred stock had meaning apart from the subsequent redemption. Petitioner itself could have met the "family corporation" exception to section 447(a) by purchasing all of the preferred stock from DeKalb and retiring it; alternatively, Adams could have purchased approximately one-half of the preferred stock. The method selected was the least costly alternative. Moreover, Adams could have purchased the preferred stock from DeKalb without borrowing the funds from petitioner, and he also could have repaid the loans to petitioner without having the shares redeemed. It is probable that Adams' purchase of the preferred stock would have been undertaken irrespective of any possibility of petitioner's subsequent redemption from Adams of those shares. Petitioner's redemption of the preferred stock from Adams was not a necessary step to complete the transaction. Accordingly, we find that petitioner's redemption of the preferred stock from Adams does not run afoul of the interdependence test.[11]

Respondent's reliance upon *Adams v. Commissioner,* 69 T.C. 1040 (1978), affd. 594 F.2d 657 (8th Cir. 1979), and *Hall v. Commissioner,* T.C. Memo. 1983-140, both of which applied the "end result" test, is inapposite. In each of those cases, we found that the subject redemption was part of a prearranged plan. In the instant case, we have found that, at the time Adams agreed to purchase the preferred stock from DeKalb, there was no prearranged plan for petitioner to redeem those shares from Adams. See *Penrod v. Commissioner, supra* (taxpayer's exchange of stock of own corporations in exchange for McDonald's stock were not interdependent steps, nor were they steps in a plan the end result of which was to "cashout" the taxpayer's interest in the restaurants; the decision to sell the stock 7 months later arose because of a subsequent business decision).

Respondent also relies on *Commissioner v. Court Holding Co., supra.* In *Court Holding,* the corporation had reached

---

[11]See *Weikel v. Commissioner,* T.C. Memo. 1986-58.

an oral agreement for the sale of an apartment house. On the advice of counsel, however, the corporation called off the sale, and declared a "liquidating dividend" in which the building was deeded to the controlling shareholders, who then immediately completed the sale. The Supreme Court agreed with this Court that despite the transfer of legal title, the gain from the sale should be attributed to the corporation, stating as follows:

The tax consequences which arise from gains from a sale of property are not finally to be determined solely by the means employed to transfer legal title. Rather, the transaction must be viewed as a whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant. A sale by one person cannot be transformed for tax purposes into a sale by another by using the latter as a conduit through which to pass title. To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress. [*Commissioner v. Court Holding Co.*, 324 U.S. at 334 (fn. ref. omitted).]

*Court Holding* is distinguishable from the case at bar, however, in that there the transactions had no legitimate nontax-avoidance business purpose. In the instant case, on the other hand, Adams' purchase of the preferred stock from DeKalb reduced by one-half the number of shares which had to be acquired by the fiscal year and, correspondingly, reduced the amount of funds needed to acquire those shares. Here, Adams was not a mere conduit for petitioner. The purchase agreement with DeKalb in effect authorized a sale of the preferred stock to petitioner, Adams, or the Cal-Maine Foods, Inc. employee stock ownership plan, see note 6 *supra.* It was determined that it was in petitioner's best interest for Adams to purchase up to 20,000 shares of the preferred stock, and he purchased that amount in three steps. Adams owned the shares purchased and his purchase of the preferred stock served a valid business purpose. Moreover, here, the tax consequences to petitioner or Adams did not differ as a result of which one *purchased* the preferred stock from DeKalb. Respondent's reliance on *Davant v. Commissioner,* 366 F.2d 874 (5th Cir. 1966), affg. in part and revg. in part *South Texas Rice Warehouse Co. v. Commissioner,* 43 T.C. 540 (1965), cert. denied 386 U.S. 1022 (1967), is inapposite for the same reasons.

Admittedly, petitioner wished to comply with the "family corporation" exception to section 447(a) for the fiscal year. We find nothing duplicitous about that goal or the manner utilized to achieve it. Petitioner determined that there were two ways in which this goal could be accomplished. Petitioner could purchase all of the preferred stock from DeKalb and then retire the stock, or Adams individually could purchase about one-half of the preferred stock using funds advanced by petitioner. As long as there is substance to what is done, there is no requirement that a taxpayer choose the more expensive way to accomplish his goals. *Gregory v. Helvering, supra; Palmer v. Commissioner,* 62 T.C. at 693. We find that there was substance here to Adams' purchase of the preferred stock.

Based on the record here, we hold that the step transaction doctrine is not applicable to the instant case.

## 2. *Intent of Congress*

Respondent further contends that petitioner may not take advantage of the "family corporation" exception to section 447(a) because petitioner is not "within the class of small or family corporations which Congress intended to exempt under section 447(c) from the requirement to report its taxable income on the accrual method of accounting." According to respondent, Congress intended the exceptions to section 447(a) to be narrowly construed; that is, only "Small Business and Family Corporations" should escape the use of the accrual method of accounting. In view of the number of its shareholders and the size of its operations, respondent argues, it is difficult to conceive that petitioner is within the class of "small business or family corporations" which Congress intended to exempt from section 447(a). Respondent asserts that "The clearest, single indication of Congress' intent regarding the size of corporations to be exempted is section 447(e), [now sec. 447(d)] which states gross receipts of $1,000,000 or less as the dividing line for small corporations. The comparison of this amount legislated by Congress to Cal-Maine's gross receipts of $376,509,206 speaks for itself."

Petitioner contends that the size and scope of operations are completely irrelevant for the purposes of the "family

corporation" exception to section 447(a). Petitioner further asserts that the "gross receipts limitation" exception of section 447(e) (now sec. 447(d)) is not applicable to the "family corporation" exception of section 447(c)(2). We agree with petitioner, at least for the years prior to the enactment of section 10205 of the Omnibus Budget Reconciliation Act of 1987 (hereinafter sometimes referred to as OBRA-1987) (Pub. L. 100-203, 101 Stat. 1330), see *infra*.[12]

---

[12]Sec. 10205 of the Omnibus Budget Reconciliation Act of 1987 (Pub. L. 100-203, 101 Stat. 1330, 1395-1397) provides in pertinent part as follows:

SEC. 10205. CERTAIN FARM CORPORATIONS REQUIRED TO USE ACCRUAL METHOD OF ACCOUNTING.

(a) GENERAL RULE.—Section 447 (relating to method of accounting for corporations engaged in farming) is amended by striking out subsections (c) and (e), by redesignating subsection (d) as subsection (e), and by inserting after subsection (b) the following new subsections:

"(c) EXCEPTION FOR CERTAIN CORPORATIONS.—For purposes of subsection (a), a corporation shall be treated as not being a corporation if it is—

"(1) an S corporation, or

"(2) a corporation the gross receipts of which meet the requirements of subsection (d).

"(d) GROSS RECEIPTS REQUIREMENTS.—

"(1) IN GENERAL.—A corporation meets the requirements of this subsection if, for each prior taxable year beginning after December 31, 1975, such corporation (and any predecessor corporation) did not have gross receipts exceeding $1,000,000. For purposes of the preceding sentence, all corporations which are members of the same controlled group of corporations (within the meaning of section 1563(a)) shall be treated as 1 corporation.

"(2) SPECIAL RULES FOR FAMILY CORPORATIONS.—

"(A) IN GENERAL.—In the case of a family corporation, paragraph (1) shall be applied—

"(i) by substituting 'December 31, 1985,' for 'December 31, 1975,'; and

"(ii) by substituting '$25,000,000' for '$1,000,000'.

"(B) GROSS RECEIPTS TEST.—

"(i) CONTROLLED GROUPS.—Notwithstanding the last sentence of paragraph (1), in the case of a family corporation—

"(I) except as provided by the Secretary, only the applicable percentage of gross receipts of any other member of any controlled group of corporations of which such corporation is a member shall be taken into account, and

"(II) under regulations, gross receipts of such corporation or of another member of such group shall not be taken into account by such corporation more than once.

"(ii) PASS-THRU ENTITIES.—For purposes of paragraph (1), if a family corporation holds directly or indirectly any interest in a partnership, estate, trust or other pass-thru entity, such corporation shall take into account its proportionate share of the gross receipts of such entity.

"(iii) APPLICABLE PERCENTAGE.—For purposes of clause (i), the term 'applicable percentage' means the percentage equal to a fraction—

"(I) the numerator of which is the fair market value of the stock of another corporation held directly or indirectly as of the close of the taxable year by the family corporation, and

"(II) the denominator of which is the fair market value of all stock of such corporation as of such time.

For purposes of this clause, the term 'stock' does not include stock described in section 1563(c)(1). [Fn. placed here reads: Copy read "1563(c)(1)."]

"(C) FAMILY CORPORATION.—For purposes of this section, [footnote placed here reads: Copy read "section."] the term 'family corporation' means—

"(i) any corporation if at least 50 percent of the total combined voting power of all classes of stock entitled to vote, and at least 50 percent of all other classes of stock of the corporation, are owned by members of the same family, and

"(ii) any corporation described in subsection (h)."

\*　　\*　　\*　　\*　　\*　　\*　　\*

As we stated earlier, section 207(c) of the Tax Reform Act of 1976 added section 447 to the Code. Section 207(c) subsequently was amended by section 404 of the Tax Reduction and Simplification Act of 1977 (Pub. L. 95-30, 91 Stat. 126, 155-156), see note 5, *supra*. In addition, section 447 subsequently has been amended by sections 351,[13] 353, (see note 9, *supra*) and 701(l) of the Revenue Act of 1978 (Pub. L. 95-600, 92 Stat. 2763); section 230 of the Tax Equity and Fiscal Responsibility Act of 1982 (Pub. L. 97-248, 96 Stat. 324); section 5(a)(28) and (29) of the Subchapter S Revision Act of 1982 (Pub. L. 97-354, 96 Stat. 1669); section 803(b) of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085); section 10205 of OBRA-1987; and section 1008(b)(6) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342.) We are

(d) EFFECTIVE DATE.—The amendments made by this section shall apply to taxable years beginning after December 31, 1987.

[13]

Sec. 351 of the Revenue Act of 1978 provides as follows:

SEC. 351. TREATMENT OF CERTAIN CLOSELY HELD FARM CORPORATIONS FOR PURPOSES OF RULE REQUIRING ACCRUAL ACCOUNTING.

(a) GENERAL RULE.—Section 447 (relating to method of accounting for corporations engaged in farming) is amended by adding at the end thereof the following new subsection:

"(h) EXCEPTION FOR CERTAIN CLOSELY HELD CORPORATIONS.—

"(1) IN GENERAL.—This section shall not apply to any corporation if, on October 4, 1976, and at all times thereafter—

"(A) members of 2 families (within the meaning of subsection(d)(1)) have owned (directly or through the application of subsection (d)) at least 65 percent of the total combined voting power of all classes of stock of such corporation entitled to vote, and at least 65 percent of the total number of shares of all other classes of stock of such corporation; or

"(B)(i) members of 3 families (within the meaning of subsection (d)(1)) have owned (directly or through the application of subsection (d)) at least 50 percent of the total combined voting power of all classes of stock of such corporation entitled to vote, and at least 50 percent of the total number of shares of all other classes of stock of such corporation; and

"(ii) substantially all of the stock of such corporation which is not so owned (directly or through the application of subsection (d)) by members of such 3 families is owned directly—

"(I) by employees of the corporation or members of their families (within the meaning of section 267(c)(4)), or

"(II) by a trust for the benefit of the employees of such corporation which is described in section 401(a) and which is exempt from taxation under section 501(a).

"(2) STOCK HELD BY EMPLOYEES, ETC.—For purposes of this subsection, stock which—

"(A) is owned directly by employees of the corporation or members of their families (within the meaning of section 267(c)(4)) or by a trust described in paragraph (1)(B)(ii)(II), and

"(B) was acquired on or after October 4, 1976, from the corporation or from a member of a family which, on October 4, 1976, was described in subparagraph (A) or (B)(i) of paragraph (1), shall be treated as owned by a member of a family which, on October 4, 1976, was described in subparagraph (A) or (B)(i) of paragraph (1).

"(3) CORPORATION MUST BE ENGAGED IN FARMING.—This subsection shall apply only in the case of a corporation which was, on October 4, 1976, and at all times thereafter, engaged in the trade or business of farming."

(b) EFFECTIVE DATE.—The amendment made by subsection (a) shall apply to taxable years beginning after December 31, 1977.

here directly concerned with the provisions added by the Tax Reform Act of 1976; however, we will also discuss changes made by section 351 of the Revenue Act of 1978 and section 10205 of OBRA-1987.

The Tax Reform Act of 1976 was enacted primarily to attack a broad category of tax shelters. *Hadley v. Commissioner*, 819 F.2d 359 (2d Cir. 1987), revg. a Memorandum Opinion of this Court, and *Garrison v. Commissioner*, 86 T.C. 764 (1986). Section 447 was one of several provisions added to the Code to help curb potential abuses resulting because special tax rules applicable to farming operated to shelter income some high-bracketed taxpayers, who acquired farms or ownership interests in farm activities, earned in other economic activities. Although originally aimed at tax shelter abuses, section 447 is not restricted solely to tax shelters. Therefore, even though petitioner is not a tax shelter, unless one of the exceptions to section 447(a) applies, petitioner must use the accrual method of accounting to compute Farms' and Dairy Fresh's income for the fiscal year.

There are no regulations or case authorities pertaining to section 447. After a review of the statute and the legislative history, we conclude that, at least for the year in suit, neither section 447 as written nor its legislative history supports respondent's position that the "family corporation" exception to section 447 is restricted to corporations with gross receipts of $1,000,000 or less.

As written, subsections (c) and (e) (now sec. 447(d)), excepted from the section 447(a) accrual accounting requirement: (1) An electing small business corporation; (2) a corporation of which at least 50 percent of the total combined voting power of all classes of stock entitled to vote and at least 50 percent of the total number of shares of all other classes of stock of the corporation are owned by members of the same family; *or* (3) a corporation which for each taxable year after December 31, 1975, did not have gross receipts exceeding $1,000,000. Therefore, under the plain meaning of the statute, family corporations are not restricted to gross receipts of $1,000,000 or less. Absent a compelling reason to disregard the plain language of the

statute, we must assume that Congress meant what it said and that the statutory language should be taken at face value. *United States v. James,* 478 U.S. 597, 606 (1986); *Hernandez-Colon v. Secretary of Labor,* 835 F.2d 958 (1st Cir. 1988); *Elliston v. Commissioner,* 82 T.C. 747, 759 (1984) (Dawson, J., concurring), affd. without opinion 765 F.2d 1119 (5th Cir. 1985). We can find no such compelling reason in the statute's legislative history.

The "gross receipts" exception, or the "small corporation" exception, to section 447(a) was not included in the version of section 447 passed by the House of Representatives.[14] Under the House version, exceptions to the general

---

[14] Pertinent portions of the House provision read as follows:

TAX REFORM ACT OF 1975, H.R. 10612, 94th Cong., 1st Sess., 1975.

SEC. 204. METHOD OF ACCOUNTING FOR CORPORATIONS ENGAGED IN FARMING.

(a) GENERAL RULE.—

(1) Subpart A of part II of subchapter E of chapter 1 (relating to methods of accounting) is amended by adding at the end thereof the following new section:

"Sec. 447. METHOD OF ACCOUNTING FOR CORPORATIONS ENGAGED IN FARMING.

"(a) GENERAL RULE.—Except as otherwise provided by law, the taxable income from farming of—

"(1) a corporation engaged in the trade or business of farming, or

"(2) a partnership engaged in the trade or business of farming, if a corporation is a partner in such partnership, shall be computed on an accrual method of accounting and with the capitalization of preproductive expenses described in section 468(c)(1).

"(b) EXCEPTION FOR SMALL BUSINESS AND FAMILY CORPORATIONS.—For purposes of subsection (a), a corporation shall be treated as not being a corporation if it is—

"(1) an electing small business corporation (within the meaning of section 1371(b)), or

"(2) a corporation—

"(A) of which at least 66 2/3 percent of the total combined voting power of all classes of stock entitled to vote and at least 66 2/3 percent of the total number of shares of all other classes of stock of the corporation, are owned by members of the same family, and

"(B) which, at such time and in such manner as the Secretary shall by regulations prescribe, elects the application of this paragraph.

"(c) MEMBERS OF THE SAME FAMILY.—For purposes of subsection (b)(2)—

"(1) the members of the same family are an individual, such individual's brothers and sisters, the brothers and sisters of such individual's parents and grandparents, the ancestors and lineal descendants of any of the foregoing, a spouse of any of the foregoing, and the estate of any of the foregoing,

"(2) stock owned, directly or indirectly, by or for a partnership or trust shall be treated as owned proportionately by its partners or beneficiaries, and

"(3) if 50 percent or more in value of the stock in a corporation (hereinafter in this paragraph referred to as 'first corporation') is owned, directly or through paragraph (2), by or for members of the same family, such members shall be considered as owning each class of stock in a second corporation owned, directly or indirectly, by or for the first corporation, in that proportion which the value of the stock in the first corporation which such members so own bears to the value of all the stock in the first corporation.

For purposes of paragraph (1), individuals related by the half blood or by legal adoption shall be treated as if they were related by the whole blood.

requirement that a corporation engaged in the trade or business of farming compute taxable income from farming on the accrual method of accounting were provided only for an electing small business corporation (within the meaning of section 1371(b)) and a family corporation, which was defined as a corporation with at least 66⅔ percent of the total combined voting power of all classes of stock entitled to vote, and at least 66⅔ percent of the total number of shares of all other classes of stock of the corporation owned by members of the same family. Under limited circumstances, members of two families could be treated as members of the same family. Also under limited circumstances, and only for purposes of applying the one family test, stock held by an employee, a member of the family of an employee, or a trust for the benefit of the employees qualified under section 401(a) and exempt from taxation under section 501(a), could be treated as held by one family. In its report to the House of Representatives, the Ways and Means Committee explained section 447 in part as follows (H. Rept. 94-658, pp. 93-94 (1975), 1976-3 C.B. (Vol. 2) 695, 785-786):

"(d) Two Families Treated as One Family under Certain Circumstances.—For purpose of subsection (b)(2), if, throughout the 10-year period ending on the date of the enactment of this section and at all times after such date of enactment—

"(1) members of two families (within the meaning of subsection (c)(1)) have owned (directly or through the application of subsection (c)) at least 80 percent of the total combined voting power of all classes of stock of a corporation entitled to vote, and at least 80 percent of the total number of shares of all other classes of stock of such corporation, and

"(2) such corporation has been engaged in the trade or business of farming,

then the members of such families shall be treated as the members of the same family. For purposes of paragraph (1), subsection (c)(3) shall be applied by substituting '40 percent' for '50 percent'.

"(e) Certain Existing Holdings of Employees and Employees' Trusts.—

"(1) In General.—For purposes of subsection (b)(2) (but not for purposes of subsection (d)), stock—

"(A) which on September 10, 1975, was owned directly by an employee of the corporation, a member of the family (within the meaning of section 267(c)(4)) of any such employee, or a trust for the benefit of the employees of such corporation which is described in section 401(a) and which is exempt from taxation under section 501(a), and

"(B) which continues to be held by the individual who held such stock on September 10, 1975, or by a member of the family (within the meaning of section 267(c)(4)) of such individual, shall be treated as held by that one family (within the meaning of subsection (c)) which, without regard to this subsection, holds the greatest percentage of the total combined voting power of all classes of stock entitled to vote.

"(2) Limitation.—The stock taken into account under this subsection with respect to any corporation shall not exceed 16 percent of the total combined voting power of all classes of stock entitled to vote, or of the total number of shares of all other classes of stock of the corporation, as the case may be."

\*      \*      \*      \*      \*      \*      \*

4. METHOD OF ACCOUNTING FOR CORPORATIONS ENGAGED IN FARMING (sec. 204 of the bill and new sec. 447 of the code)

*Present Law*

Under present law, a taxpayer engaged in farming activities may report the results of such activities for tax purposes on the cash method of accounting, regardless of whether the taxpayer is an individual, a corporation, a trust, or an estate. As indicated by your committee in the discussion of the LAL limitation (sec. 101 of the bill), the availability of the cash method for farmers contrasts with the tax rules which govern nonfarm taxpayers engaged in the business of selling products. Such nonfarm taxpayers must report their income using the accrual method of accounting and must accumulate their production costs in inventory until the product is sold. [Fn. ref. omitted.] Under the accrual method of accounting as applied to farming, if crops are harvested and unsold at the end of the taxable year, the costs attributable to such crops cannot be deducted in the taxable year but must be treated as inventory. However, even under the accrual method, a farmer is permitted to deduct expenses paid in the taxable year so long as the crops to which these expenses relate are unharvested at the end of the taxable year. (I.T. 1368, I-1 C.B. 72 (1922).)

*General reasons for change*

Under the cash method of accounting, all items which constitute gross income are reported in the taxable year in which actually or constructively received, and expenses are deducted in the taxable years in which they are actually paid. The primary advantage of the cash method is that it generally requires a minimum of recordkeeping; however, it frequently does not match income with related expenses. Consequently, the cash method can be used to create tax losses which defer current tax liabilities on both farm and nonfarm income. Corporations, as well as individuals, can benefit by the time value of such deferral of taxes.

The opportunity for farmers generally to use the cash method of accounting, without inventories and with current deduction of certain expenses which are properly capitalizable, was granted over 50 years ago by administrative rulings. These rulings were issued at a time when most agricultural operations were small operations carried on by individuals. The primary justification for the cash method of accounting for farm operations was its relative simplicity which, for example, eliminates the need to identify specific costs incurred in raising particular crops or animals.

In recent years, however, many corporations have entered farming. While some of these corporations involve relatively small business operations owned by a family or a few individuals, other corporations conduct large farm businesses which have ready access to the skilled accounting assistance often required to identify specific farm costs. In addition, sophisticated farm operations have often been carried on by farm syndicates or partnerships consisting of high-income investors and a corporation representing a promoter of a farm "tax shelter".

In view of this, your committee believes it is appropriate to require corporations, and certain partnerships, engaged in farming to use an accrual method of accounting with the capitalization of certain preproductive period expenses. Your committee, however, has excepted from this requirement certain small or family corporations in order to continue the cash basis method of accounting essentially for all those but the larger corporations engaged in farming. [Fn. 2 in Committee Report] [15]

There was no comparable provision in the version of the bill passed by the Senate. The Conference Committee added an exception for nurseries and "small corporations," reduced the percentage of ownership members of one family needed to meet the "family corporation" exception from 66⅔ percent to 50 percent, and eliminated the "two-family" ownership and stockholdings of certain employees provisions. The Conference report in pertinent part described section 447 as follows (S. Rept. 94-1236 (Conf.) at 415-416 (1976), 1973-3 C.B. (Vol. 3) 807, 819-820):

204(c). Accrual Accounting for Farm Corporations

*House bill.*—Under present law, any taxpayer engaged in farming may use the cash method of accounting and generally can deduct preproductive period expenses. The House bill generally requires any corporation (other than a subchapter S corporation or a family corporation) and any partnership in which a corporation is a partner to use the accrual method of accounting and to capitalize preproductive period expenses. This provision applies to taxable years beginning after December 31, 1975.

*Senate amendment.*—No provision.

*Conference agreement.*—The conference agreement follows the House bill with several modifications.

The exception for family corporations is broadened by providing that a corporation can qualify if the members of one family own, directly or through attribution, at least 50 percent (rather than 66⅔ percent) of the voting stock and of all other classes of stock of such corporation. (The lowering of this percentage makes unnecessary two special rules in the House bill, relating to "two-family" ownership and existing stockholdings of certain employees.) The family corporation exception in the House bill is also broadened by allowing attribution of stock ownership, under certain circumstances, through two tiers of corporations. [Fn. ref. omitted.]

*The conference agreement also added an exception to cover small corporations* since a principal justification for use of the cash method of accounting in agriculture is that small enterprises should not be required

---

[15]Fn. 2 in the Committee report reads as follows: "Since the new rules for corporations engaged in farming do not apply to subchapter S corporations, any corporation with ten or fewer shareholders may elect subchapter S status and thus be exempt from being required to be on the accrual method of accounting."

to keep books and records on the accrual method of accounting. The provision exempts any corporation whose gross receipts (when combined with the gross receipts of related corporations) do not exceed $1,000,000 per year. However, once this level of receipts is exceeded for a taxable year beginning after December 31, 1975, the corporation must change to the accrual method of accounting for subsequent taxable years and may not change back to the cash method of accounting for subsequent taxable years even if its receipts subsequently fall below $1,000,000. [Emphasis added.]

The subsequent General Explanation of the Tax Reform Act of 1976, prepared by the Staff of the Joint Committee on Taxation, states, in pertinent part, as follows (pp. 53-55) (Comm. Print 1976), 1976-3 C.B. (Vol. 2) 1, 65-67):

*Explanation of provisions*

*In general.*—The act adds a new provision to the Code (sec. 447) which requires that corporations (other than nurseries, *certain "family owned" corporations,* subchapter S corporations, *and certain corporations with annual gross receipts of less than $1,000,000)* and certain partnerships to use the accrual method of accounting for farm operations and also to capitalize their preproductive period expenses of growing or raising crops or animals.

\*       \*       \*       \*       \*       \*       \*

*Certain excepted corporations.*—The Act provides a series of exceptions to the rule that farming corporations must use the accrual accounting method. One exception to the required accrual accounting rules is provided for nurseries. Thus, a corporation which is engaged in the business of operating a nursery will not be required to utilize the accrual method of accounting by reason of this provision of the Act. No inference is intended, however, with respect to any business operation which is required to utilize the accrual method of accounting under provisions of prior law.

Subchapter S corporations, which by definition can have no more than 15 shareholders, and certain family owned corporations are also excepted from the requirement of accrual accounting. A shareholder of a subchapter S corporation, however, is to be subject to the at risk provisions of the Act, and the corporation itself may also be farming syndicate.

A family corporation (excepted from the requirements of section 447) includes a corporation in which at least 50 percent of the total combined voting power of all classes of stock entitled to vote, and at least 50 percent of the total number of shares of all other classes of stock, are owned by members of the same family. For purposes of this provision, the members of a family are an individual, his brothers and sisters, the brothers and sisters of such individual's parents and grandparents, ancestors and lineal descendants of any of the above, a spouse of any of

the above, and the estate of any of these individuals. Ownership of stock by a trust or partnership is to be proportionately attributed to its beneficiaries or partners, as the case may be. [Fn. ref. omitted.] Also, stock ownership is to be attributed proportionately through a corporate shareholder (in a farm corporation) to the owners of the corporate shareholder if 50 percent or more in value of the corporate shareholder is owned by members of the same family. [Fn. ref. omitted.] In applying these rules, individuals related by the half-blood or by legal adoption are treated as if they were related by the whole blood.

Since a principal justification for use of the cash method of accounting in agriculture is that small enterprises should not be required to keep books and records on the accrual method of accounting, *a fourth exception to required accrual accounting covers small corporations.* The provision exempts any corporation whose gross receipts (when combined with the gross receipts of related corporations) do not exceed $1,000,000 per year. However, once this level of receipts is exceeded for a taxable year beginning after December 31, 1975, the corporation must change to the accrual method of accounting for subsequent taxable years and may not change back to the cash method of accounting for subsequent taxable years even if its receipts subsequently fall below $1,000,000. [Fn. ref. omitted; emphasis added.]

This legislative history clearly supports petitioner's position that the size and scope of its operations are completely irrelevant for purposes of the "family corporation" exception to section 447(a), at least prior to the enactment of section 10205 of OBRA-1987. Respondent's contention, reputedly supported by the Ways and Means Committee Report, that Congress intended to limit the "family corporation" exception to "small family corporations" with gross receipts of $1,000,000 or less is contrary to the plain meaning of the statute and finds no support in the legislative history. At most, the legislative history reveals that Congress never contemplated that a large, widely held corporation, such as petitioner, could meet the requirements of the "family corporation" exception. We cannot assume however, as respondent would have us do, that had Congress considered this factor, it would have further limited family corporations in the manner suggested by respondent.

We do not find it fatal for petitioner that, in order to satisfy the percentage ownership requirement, petitioner arranged for Adams to acquire from DeKalb the appropriate number of shares of the preferred stock. For example, the Ways and Means Committee Report, in effect, in its note 2 (see note 15, *supra*) invited any corporation with 10 or fewer

shareholders to elect subchapter S corporation status in order to be exempt from section 447(a). We cannot conclude, on the basis of the legislative history, that had it considered the matter, the Committee members would not equally have encouraged corporations which validly could to rearrange their stock ownership to meet the "family corporation" exception to section 447(a).

We have found nothing in the legislative history, at least prior to OBRA-1987, that would require us to conclude that Congress did not mean exactly what it said in the text of section 447. See *Foil v. Commissioner,* 92 T.C. 376, 408 (1989); *Gunther v. Commissioner,* 92 T.C. 39, 64-65 (1989); *Pallottini v. Commissioner,* 90 T.C. 498, 503 (1988). Absent conflict between reasonably plain meaning and legislative history, the words of the statute must prevail. *Aaron v. SEC,* 446 U.S. 680, 700 (1980). Consequently, we hold that, for the fiscal year ended June 3, 1978, petitioner did not have to have gross receipts of $1,000,000 or less in order to meet the "family corporation" exception to section 447(a).

Our conclusion that family corporations as defined for the fiscal year at issue were not subject to a gross receipts limitation is confirmed by two subsequent events. First, in 1978 Congress rejected changes to section 447 proposed by the Administration which would have applied the gross receipts limitation to family corporations in exactly the same manner suggested here by respondent.

Included in the President's 1978 Tax Reduction and Reform Proposals was a recommendation that: "All farming syndicates and all farm corporations, except nurseries, subchapter S corporations, and those with gross receipts of $1 million or less would be required to use accrual accounting and to capitalize preproductive period expenses." Thus, under the 1978 Administration proposal, a family farming corporation would have been required to use an accrual method of accounting and to capitalize preproductive period expenses unless another exception to section 447(a) applied. See Summary of the President's 1978 Tax Reduction and Reform Proposals [Prepared for the Use of the Committee on Ways and Means by the Staff of the Joint Committee on Taxation, 95th Cong., 2d Sess. (Committee Print January 27, 1978).]

The Administration proposal relating to section 447 was described in pertinent part (pp. 29-31, Tax Reduction and Reform Proposals: No. 2., Tax Shelters and Minimum Tax [Prepared for the Committee on Ways and Means by the Staff of the Joint Committee on Taxation (Committee Print April 14, 1978]) as follows:

### BACKGROUND

The provisions relating to farming syndicates and accrual accounting for farming corporations were enacted in 1976. As noted above, the effective date of the provisions concerning accrual accounting for farming corporations was postponed for one year for certain corporations controlled by two to three families.

The accrual accounting for farming corporations provision in the 1976 Act was based on the Ways and Means version of that Act. However, under this version, the only two exceptions were the subchapter S exception and a more stringent exception for family corporations than the one which was enacted. The later exception in the Ways and Means version was generally based on the 66⅔-percent stock ownership by one family rather than the 50-percent ownership requirement.

The farming syndicate provision has not previously been considered by the Ways and Means Committee. It originated in the Senate's consideration of the 1976 Act and, coupled with an expanded at risk provision applicable to farming activities, was the Senate's substitute for the House-passed LAL (Limitation on Artificial Losses) approach to farming shelters.

### ADMINISTRATION PROPOSAL

The Administration proposal would eliminate the family corporation exception to the required farm accrual accounting provision. The proposal would also extend the accrual accounting requirement to all farming syndicates, regardless of size, and would provide that State and local taxes other than real property taxes and income taxes would no longer be specifically excepted from treatment as preproductive period expenses.

*Effective date*

This provision would apply to taxable years beginning after December 31, 1978.

\* \* \* \* \* \* \*

### ISSUES

*Accrual Accounting*

A fundamental issue raised by this proposal is whether the cash method of accounting in farming is to be available for certain relatively large farming operations and farming syndicates.

The Treasury states that the administrative reason for allowing farmers to use the cash method of accounting was that farmers lack the financial resources and expertise necessary to utilize the accrual method

of accounting, despite the fact that the latter method properly matches farming expenditures with related farming income. As a result, the cash receipts and disbursements method was permitted because of its greater simplicity. The Treasury contends that large farming corporations cannot claim that they lack access to the sophisticated accounting and record-keeping procedures involved in the accrual method of accounting. Also, most large companies already are required to keep financial records on an accrual basis in order to obtain certification of financial statements by an accountant. *Treasury states that the 1976 Act did not go far enough in its application of the accrual accounting requirement. Under the "family corporation" exception, corporations with annual gross sales in excess of $50 million can continue to use the cash method of accounting. Treasury states that a fundamental inequity of the 1976 Act is that the distinction between family and nonfamily corporations bears no relationship to the rationale of preserving simple bookkeeping methods for small farmers who truly lack access to the necessary accounting and record-keeping procedures involved in the accrual method of accounting.*

*The Administration proposal would place large family-controlled farm corporations on the same tax accounting method as other large farming corporations.* This should eliminate any income tax advantage between these large family farm operations and other large farming corporations which might arise by reason of the tax accounting rules. Since it may be argued that larger corporations have a competitive advantage because of their size over smaller farming operations, it does not appear to be as much of a competitive problem if small farm operations are given a tax accounting advantage over the large ones as to give some large operations a tax advantage over other operations of the same size.

Furthermore, Treasury contends that the rationale for cash accounting is inapplicable in instances where interests in farming operations are required to be registered with Federal or State securities officials, or where substantial portions of the enterprise are owned by passive investors, because the persons who are involved in farming as outside investors should not share in the cash accounting privilege designed for farmers unaccustomed to sophisticated financial transactions and recordkeeping. However, since the term farming syndicates includes any enterprise in which more than 35 percent of the losses are allocable to nonfamily passive investors, farming syndicates may be relatively small operations not necessarily involving sophisticated taxpayers.

Neither existing law nor the Administration proposal would require large proprietorships or partnerships (other than farming syndicates) to use an accrual method of accounting. Consequently, to the extent that there are large proprietorships or partnerships in farming, they would continue to have a tax advantage over farming corporations of the same size. [Emphasis added.]

Moreover, in his statement assessing the subsequent bill passed by the House of Representatives which rejected the Administration's proposal and instead extended the family

corporation exception to certain corporations controlled by two or three families, Secretary of the Treasury W. Michael Blumenthal stated (Treasury Statement before the Senate Finance Committee, pp. 183, 193, Hearings before the Senate Finance Committee on H. R. 13511, 95th Cong., 2d Sess., Part 1) (Aug. 17, 1978) (Committee Print) in part as follows:

BUSINESS TAX CHANGES

\*    \*    \*    \*    \*    \*    \*

*Farm accounting*

The Tax Reform Act of 1976 generally requires farming corporations to use the accrual method of accounting in order to match properly farming expenses with farming income. That Act contains exceptions from the accrual accounting requirement for certain corporations. *One of the exceptions is for corporate farms with annual gross receipts of $1 million or less; another exception is for farms controlled by one family, without regard to size or the extent of public ownership.*

The Administration has recommended the repeal of the one-family corporation exception, so that large corporate farms would be subject to accrual accounting requirements regardless of whether they are family owned. We have also recommended an extension of the accrual accounting requirement to farm syndicates. *There is no reason to permit multi-million dollar corporations and tax shelter syndicates to utilize a cash accounting privilege designed for unsophisticated taxpayers.*

In lieu of the Administration's proposal, the House adopted an additional exception to the accrual accounting rules for certain farm corporations owned by two or three families. The stated purpose of the House provision is to avoid competitive advantages for one-family corporations now permitted to use cash accounting. We feel that the President's proposals provide the appropriate means of eliminating the competitive imbalances caused by the accrual accounting exceptions. However, if this Committee decides not to adopt the President's recommendations in this area, we will not object to the additional exceptions in the House bill. \* \* \* [Emphasis added.]

The Senate Finance Committee also rejected the Administration proposal and instead agreed to the accrual accounting provisions for farming corporations contained in the House bill (p. 12, Senate Finance Committee, P.R. #78 (September 27, 1978).) This provision subsequently was enacted by Congress as section 351 of the Revenue Act of 1978.

The interpretation of the "family corporation" exception to section 447(a) which respondent urges this Court to

adopt in the instant case would accomplish the same result as the Administration's proposal for family corporations recommended as part of its 1978 Tax Reduction and Reform Proposals. Congress rejected the Administration's proposal in 1978. It would appear that respondent here is attempting to achieve judicially what was denied him then by Congress. This we cannot and will not do. Respondent's interpretation is clearly contrary to the plain meaning of the statute. We must apply the statute as written.

Second, our conclusion that respondent's interpretation of section 447(c) must be rejected is again confirmed by Congress's enactment in 1987 of section 10205 of OBRA-1987. See note 12, *supra.* Sections 447(c) and (d) as amended by section 10205(a) of OBRA-1987, among other things, provide that for corporations and certain partnerships the cash basis method of accounting is permitted only for an S corporation; a corporation which, for each prior taxable year beginning after December 31, 1975, does not have gross receipts exceeding $1,000,000; and a family corporation if, for each prior taxable year beginning after December 31, 1985, the corporation did not have gross receipts exceeding $25,000,000. See 2 J. Mertens, Law of Federal Income Taxation, sec. 12.142 (1989 Supp.). The amendments made by OBRA-1987 section 10205(a) are effective for taxable years beginning after December 31, 1987. Sec. 10205(d), Pub. L. 100-203, 101 Stat. 1330-397. Congress has selected a gross receipts ceiling for family corporations of $25,000,000, not the $1,000,000 suggested here by respondent. Thus, there can be no doubt that respondent's position here is totally without support.

Consequently, we hold for petitioner.

We have considered the other arguments raised by the parties and find them unpersuasive. To reflect the agreement of the parties as to other issues not tried,

*Decision will be entered under Rule 155.*