T.C. Memo. 1999-289

UNITED STATES TAX COURT

RICHARD DAVID CZEPIEL, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2826-98.                    Filed August 30, 1999.

Richard David Czepiel, pro se.

<u>Carmino J. Santaniello</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined a deficiency in petitioner's Federal income tax (tax) for 1995 in the amount of $16,204.

The issues remaining for decision are:

(1)  Is petitioner required to include in his gross income for 1995 the distributions that he made during that year from his individual retirement accounts (IRA's)?  We hold that he is.

(2)  Is petitioner liable for the 10-percent additional tax under section 72(t)(1) with respect to the distributions referred to above?[1]  We hold that he is.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Petitioner Richard David Czepiel (Mr. Czepiel), who was born on July 23, 1946, resided in Holyoke, Massachusetts, at the time the petition was filed.

Mr. Czepiel married Kathleen Marie Quinlan (Ms. Czepiel) on October 23, 1982.  During their marriage, they had two children, Sean and Ryan.

On January 11, 1995, the Probate and Family Trial Court for the Commonwealth of Massachusetts (Family Court) entered a judgment of divorce nisi (divorce judgment) which dissolved the marriage of Mr. Czepiel and Ms. Czepiel.  In the divorce judgment, the Family Court, inter alia, ordered (1)(a) Ms. Czepiel to convey to Mr. Czepiel all of her right, title, and interest in

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

certain real property in which they and their two children had been living prior to their divorce (marital residence) and (b) Mr. Czepiel to assume and pay the existing mortgage loan on that property; (2) Ms. Czepiel to retain her two IRA accounts; (3)(a) Mr. Czepiel to retain a certain automobile and (b) Ms. Czepiel to execute any documents necessary to have the title to that automobile solely in Mr. Czepiel's name; and (4) Mr. Czepiel to pay to Ms. Czepiel "the sum of twenty-nine thousand ($29,000.) dollars as a further division of marital property".

In January 1995, the total equity in the marital residence was approximately $25,000, which represented less than 25 percent of its fair market value at that time. At that time, Mr. Czepiel was several months behind in his mortgage loan payments on the marital residence, which resulted in threats of foreclosure by the mortgage loan holder, he had exceeded the credit limit on each of his credit cards, and he was unable to borrow against the marital residence. The only funds available to petitioner in January 1995 consisted of approximately $33,000 on deposit in two IRA's that he maintained at BayBank. The foregoing financial situation with respect to Mr. Czepiel did not change over the period January 1995 through July 1995.

On January 20, 1995, Mr. Czepiel filed a motion for clarification of the divorce judgment and to amend that judgment with

respect to child support.  The Family Court denied that motion on January 25, 1995.

On February 27, 1995, Ms. Czepiel filed with the Family Court a complaint against Mr. Czepiel for contempt.  In that complaint, Ms. Czepiel alleged that Mr. Czepiel had not obeyed the divorce judgment in that he had failed to pay her the sum of $29,000 as a division of marital assets, as ordered by that judgment.  On March 21, 1995, after a hearing, the Family Court issued a temporary order on contempt.  In that order, the Family Court found that Mr. Czepiel was guilty of contempt of court for having willfully failed and refused to obey the divorce judgment in that he neglected and refused to pay $29,000 to Ms. Czepiel as a division of marital assets.  That temporary order on contempt directed Mr. Czepiel to pay Ms. Czepiel the sum of $29,000 on or before April 11, 1995, and continued the hearing with respect to Mr. Czepiel's contempt until that date.

On March 1, 1995, Mr. Czepiel filed another motion with the Family Court for clarification of the divorce judgment, in which he asked, inter alia, that the Family Court "break down the $29,000 division of marital property to specify the amount taken as equity in the house [marital residence]."  On March 29, 1995, the Family Court denied that motion as it pertained to that request.

On April 11, 1995, after a hearing, the Family Court issued another temporary order on contempt. In that order, the Family Court found that Mr. Czepiel was guilty of contempt of court for having willfully failed and refused to obey the divorce judgment in that he neglected and refused to pay the sum of $29,000 as a division of marital assets. That temporary order on contempt directed Mr. Czepiel to pay that sum to Ms. Czepiel's attorney on or before 4:00 P.M. on April 12, 1995, and indicated that in the event that Mr. Czepiel failed to comply with that order, the Family Court would impose sanctions of $100 per day. That order also continued the hearing with respect to Mr. Czepiel's contempt until April 25, 1995.

On April 11, 1995, in an effort to comply partially with the Family Court's order, Mr. Czepiel directed BayBank to transfer $21,000 from his IRA account No. 39231705 (IRA 1) and $8,000 from his IRA account No. 36009969 (IRA 2) to Ms. Czepiel's IRA at Fleet Bank. Ms. Czepiel refused the two transfers from Mr. Czepiel's IRA's at BayBank because she believed that those transfers did not constitute cash payments and would be taxable to her when she withdrew the funds from her IRA at Fleet Bank.

On April 12, 1995, Ms. Czepiel filed a motion to enforce the contempt judgment against Mr. Czepiel and to impose fines on him (Ms. Czepiel's motion). In that motion, Ms. Czepiel indicated that Mr. Czepiel refused to comply with the divorce judgment and

instead attempted to transfer funds from his IRA's to her IRA. In Ms. Czepiel's motion, Ms. Czepiel asked the Family Court to order Mr. Czepiel to pay by certified check or money order by 4:00 P.M. on April 14, 1995, the sum of $29,000 to which she was entitled under the divorce judgment. Ms. Czepiel also requested that the Family Court impose daily fines of $100 as previously established in the temporary order on contempt issued by the Family Court on April 11, 1995. The Family Court granted Ms. Czepiel's motion on April 14, 1995.

On April 25, 1995, after a hearing, the Family Court issued a temporary order on contempt. In that order, the Family Court found that Mr. Czepiel failed to pay the sum of $29,000 pursuant to the Court's temporary order of contempt issued on April 11, 1995, imposed sanctions on Mr. Czepiel in the amount of $1,300, directed him to pay Ms. Czepiel's attorney a total of $30,300 (increased amount awarded to Ms. Czepiel) by 4:00 P.M. on April 25, 1995, and indicated that in the event that Mr. Czepiel failed to comply with the foregoing orders, it would issue a capias for his arrest and incarceration.

On May 3, 1995, Mr. Czepiel prepared and submitted to BayBank an IRA withdrawal form with respect to IRA 1. In that form, Mr. Czepiel directed BayBank to withdraw $22,300 from that IRA and to mail a check in the amount of that withdrawal to Mr. Czepiel's home address. The reason checked by Mr. Czepiel in the

IRA withdrawal form with respect to his requested withdrawal of $22,300 from IRA 1 was "Premature distribution (distribution before age 59½ and not disabled or taking substantially equal instalments over life expectancy)". On May 5, 1995, BayBank complied with Mr. Czepiel's request, withdrew $22,300 from IRA 1, and mailed him a check for that amount. On the same day, Mr. Czepiel gave Ms. Czepiel's attorney $22,300. Mr. Czepiel attempted to withdraw $8,000 from IRA 2 in order to pay the tax due on the premature withdrawal from IRA 1 and to pay the excess, if any, to Ms. Czepiel. However, petitioner did not succeed in withdrawing those funds from IRA 2 because they were lost electronically, which resulted in delays in Family Court proceedings.

On May 10, 1995, Mr. Czepiel filed a motion with the Family Court for reconsideration of division of assets. In that motion, Mr. Czepiel asked that "the $29000.00 further division of assets be broken down as $12,500 cash and $16,500 as a transfer of IRA's". On June 14, 1995, the Family Court denied Mr. Czepiel's motion.

Also on May 10, 1995, Mr. Czepiel filed a motion with the Family Court for reconsideration and elimination of the $1,300 in sanctions that that court had imposed on him. The Family Court denied that motion.

As of May 11, 1995, Mr. Czepiel still had not paid Ms. Czepiel $8,000 of the $30,300 increased amount awarded to Ms.

Czepiel.  Consequently, on that date, the Family Court issued a capias ordering Mr. Czepiel's arrest.

On May 26, 1995, Mr. Czepiel filed a motion with the Family Court for instructions regarding "How To Divide Marital Property" under the divorce agreement.  In that motion, Mr. Czepiel indicated that "There is no cash money in the divorce to divide and pay my wife $29,000.  Please issue a court order on how I can pay the $29,000.  I need to know what to do to accomplish this.  I need specific instructions."  On June 14, 1995, the Family Court denied Mr. Czepiel's motion.

On July 21, 1995, after hearing, the Family Court issued a judgment of contempt in which it found Mr. Czepiel guilty of contempt of court for having willfully failed and refused to obey the divorce judgment in that he neglected and refused to pay Ms. Czepiel the balance of $8,000 as a division of marital assets. The Family Court ordered in that judgment that Mr. Czepiel be incarcerated in the Hampden County jail in Ludlow, Massachusetts, until he purged himself of his contempt by payment of $8,000.  On the same date, Mr. Czepiel was arrested at the courthouse in Springfield, Massachusetts, and immediately transported to and incarcerated in that facility.

On July 27, 1995, while Mr. Czepiel was incarcerated, he withdrew $8,000 from IRA 2, which BayBank paid by issuing a check to him in that amount.  On July 31, 1995, Mr. Czepiel transferred

the $8,000 that he withdrew from IRA 2 to Ms. Czepiel's attorney. Consequently, on July 31, 1995, the Family Court ordered petitioner's release from jail.

BayBank charged Mr. Czepiel a fee (premature withdrawal fee) in the amount of $362 for his having made premature distributions from his IRA's. BayBank charged that fee against the balances in those IRA's.

The Internal Revenue Service did not receive petitioner's tax return for 1995 until March 17, 1997. In that return, petitioner included in his gross income $46,902 of wages but did not include therein any portion of the amounts totaling $30,662 that were distributed from his IRA's during that year (IRA distributions).

In the notice of deficiency (notice) issued to petitioner for 1995, respondent determined, inter alia, that petitioner failed to include in his gross income $30,762[2] which was distributed from his IRA's during that year and that he is liable

---

[2]Respondent determined in the notice, and the parties stipulated and contend on brief, that petitioner's IRA distributions during 1995 totaled $30,762. We disagree. On the record before us, we have found that petitioner's IRA distributions consisted of the $22,300 which he withdrew from IRA 1, the $8,000 which he withdrew from IRA 2, and the $362 which was withdrawn from his IRA's to pay the premature withdrawal fee which BayBank charged Mr. Czepiel and that those distributions totaled $30,662. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989).

for the 10-percent additional tax under section 72(t)(1) with respect to that amount.

OPINION

Petitioner bears the burden of proving that the determinations in the notice are erroneous. See Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).

We first consider whether the IRA distributions are includible in petitioner's gross income for 1995. Petitioner contends that they are not. In support of that contention, petitioner argues that

> there was gross negligence by the [Family] court and my
> ex-wife's lawyer that caused the money to be removed
> from the IRA. * * *
>
>    *       *       *       *       *       *       *
>
> This was a forced withdrawal. * * *
>
>    *       *       *       *       *       *       *
>
> This is a QDRO in substance.  414(p)
>
>    1.  Payment was made directly to spouse.
>
>    2.  Recipient (Ex-wife) did not put distribu-
>        tion in a qualified plan.
>
>    3.  Ex-wife should be subject to tax for not
>        putting it in a qualified plan.
>
>    4.  No liability for petitioner- Section
>        402(a)(9)(Now section 402(e)(i)(a) state
>        an exception to this general \ rule.  An
>        alternate payee (who is a wife or former
>        wife of the plan participant) shall be
>        treated as the distrubutee of any distri-

bution made to such payee under a QDRO.
[Reproduced literally.]

Petitioner appears to be arguing that the divorce judgment is a qualified domestic relations order (QDRO) as defined in section 414(p) because the Family Court in effect ordered him to satisfy the increased amount awarded to Ms. Czepiel by making the IRA distributions since the only funds available to him in January 1995 to pay that amount consisted of approximately $33,000 on deposit in his IRA's. Respondent counters that the divorce judgment is not a QDRO and that petitioner's reliance on section 402(e)(1)(A) is misplaced. We agree with respondent.

The provision requiring a taxpayer to include in gross income an amount paid or distributed from an IRA is section 408(d)(1). That section provides:

> (1) In general.--Except as otherwise provided in this subsection, any amount paid or distributed out of an individual retirement plan shall be included in gross income by the payee or distributee, as the case may be, in the manner provided under section 72.

The term "individual retirement plan" in section 408(d)(1) includes an IRA. See sec. 7701(a)(37)(A).

Section 402(e)(1)(A) on which petitioner relies does not operate as an exception to section 408(d)(1).[3] Only an exception

---

[3]Even if it did, on the record before us, we find that petitioner has failed to establish that the divorce judgment qualifies as a QDRO as defined in sec. 414(p).

provided in section 408(d) may change the result mandated by section 408(d)(1).  See sec. 408(d)(1).  Thus, unless an exception in section 408(d) applies in the instant case, petitioner must include the IRA distributions in his gross income for 1995.

The only exception to section 408(d)(1) that might apply in the present case is section 408(d)(6), which provides:

> (6)  Transfer of account incident to divorce.--The transfer of an individual's interest in an individual retirement account or an individual retirement annuity to his spouse or former spouse under a divorce or separation instrument described in subparagraph (A) of section 71(b)(2) is not to be considered a taxable transfer made by such individual notwithstanding any other provision of this subtitle, and such interest at the time of the transfer is to be treated as an individual retirement account of such spouse, and not of such individual.  Thereafter such account or annuity for purposes of this subtitle is to be treated as maintained for the benefit of such spouse.

In order for the exception in section 408(d)(6) to apply in the instant case, inter alia, there must have been a transfer of petitioner's interest in his IRA's to Ms. Czepiel, his former spouse.  Petitioner did not transfer all or a portion of his interest in his IRA's to Ms. Czepiel.  He received distributions from those IRA's and paid the funds distributed to him from those IRA's to Ms. Czepiel.

Another requirement that must be satisfied in order to come within the exception to section 408(d)(1) provided in section 408(d)(6) is that the transfer of an individual's interest in an IRA must be made under a divorce or separation agreement de-

scribed in section 71(b)(2)(A). Although the divorce judgment of the Family Court qualifies as a divorce or separation agreement described in section 71(b)(2)(A), that judgment did not order petitioner to transfer all or a portion of his interest in his IRA's to Ms. Czepiel. The divorce judgment of the Family Court ordered petitioner to pay Ms. Czepiel "the sum of twenty-nine thousand ($29,000.) dollars as a further division of marital property".

On the record before us, we find that the petitioner has failed to establish that the IRA distributions are to be excluded from his gross income for 1995.[4]

We next consider whether petitioner is liable for the 10-percent additional tax under section 72(t)(1) (early withdrawal tax) with respect to the IRA distributions. Section 72(t)(1) provides:

> (1) Imposition of additional tax.--If any tax-payer receives any amount from a qualified retirement plan (as defined in section 4974(c)), the taxpayer's tax under this chapter for the taxable year in which such amount is received shall be increased by an amount equal to 10 percent of the portion of such amount which is includible in gross income.

A "qualified retirement plan" includes an IRA. See sec. 4974(c)(4). According to petitioner, the early withdrawal tax does not apply because the IRA distributions are not includible

---

[4]The record contains no evidence regarding the amounts that Mr. Czepiel contributed to his IRA's.

in his gross income for 1995.  We reject that contention.  We have found that those distributions are includible in petitioner's gross income for that year.

As we understand it, petitioner argues in the alternative that he is not liable for the early withdrawal tax with respect to the IRA distributions because the Family Court in effect required him to make those distributions in order to pay the increased amount awarded to Ms. Czepiel, and he therefore made those distributions involuntarily.  In support of his alternative position, petitioner relies on Larotonda v. Commissioner, 89 T.C. 287 (1987), and Murillo v. Commissioner, T.C. Memo. 1998-13, affd. without published opinion on other issues 166 F.3d 1201 (2d Cir. 1998).  Respondent counters that there are no statutory exceptions to the early withdrawal tax which apply in the instant case and that the cases relied on by petitioner are distinguishable from the present case and therefore are not controlling here.

We first address whether there are any statutory exceptions in section 72(t) to the early withdrawal tax which apply here. On the record before us, we find that petitioner has failed to show that any such statutory exceptions apply so as to preclude imposition of the early withdrawal tax with respect to the IRA distributions.

We turn now to petitioner's reliance on Larotonda v. Commissioner, supra, and Murillo v. Commissioner, supra. We find those cases to be distinguishable from the present case and petitioner's reliance on them to be misplaced.

In Larotonda, the Commissioner of Internal Revenue (Commissioner) assessed a tax deficiency against the taxpayer and thereafter levied upon his retirement plan, which was a so-called KEOGH plan. See Larotonda v. Commissioner, supra at 289. The Commissioner argued that the taxpayer's gross income included the levied funds and that the early withdrawal tax imposed by former section 72(m)(5)(B) applied to those funds. See id. at 290. We held that although the levied funds were includible in the taxpayer's gross income, the early withdrawal tax did not apply with respect to those funds. See id. at 291, 292. We examined the legislative history behind former section 72(m)(5)(B) and concluded that "Congress intended to prevent the voluntary, tax-motivated withdrawal of funds by taxpayers prior to retirement age." Id. at 292. We found on the record in Larotonda that no such voluntary, tax-motivated withdrawal of funds occurred, see id., and that "To the contrary, the funds were withdrawn pursuant to respondent's levy, an involuntary act, without any active participation", id., by the taxpayer.

In Murillo v. Commissioner, supra, the taxpayer entered into a plea agreement as a result of having been indicted for various

financial crimes. In a related civil proceeding, a decree of forfeiture was issued pursuant to 18 U.S.C. sec. 981 (1994), which required the taxpayer to forfeit his funds on deposit in a variety of accounts, including certain IRA's. See id. Although the taxpayer included the funds forfeited from his IRA's as gross income in his tax return, he did not report in that return that he was liable for the early withdrawal tax with respect to those funds. See id. We held on the record presented to us in Murillo that Larotonda v. Commissioner, supra, was controlling. We indicated in Murillo that

> the decree of forfeiture not only triggered but was itself the event which constituted the IRA withdrawals. * * * Moreover, * * * petitioner herein neither received nor had control of the use of the IRA distributions. * * *

Id. Consequently, we held in Murillo that the taxpayer was not liable for the early withdrawal tax. See id.

In Larotonda v. Commissioner, supra, the Commissioner's levy triggered the taxable event without any active participation by the taxpayer, and we were concerned that Congress did not intend the additional tax under former section 72(m)(5) to apply to such a situation. In Murillo v. Commissioner, supra, the decree of forfeiture that forfeited to the United States, inter alia, the taxpayer's IRA accounts "not only triggered but was itself the event which constituted the IRA withdrawals." In contrast, in the present case, the IRA distributions were not made without any

active participation by petitioner.  Petitioner initiated, received, and controlled the withdrawals from his IRA's, which he used to pay Ms. Czepiel the sum of $30,300 which the Family Court ordered him to pay her, and the additional distribution from petitioner's IRA's of $362 was made by BayBank in order to pay that bank's fee for Mr. Czepiel's having made those premature withdrawals.

On the record before us, we find that petitioner has failed to show that the early withdrawal tax does not apply to the IRA distributions totaling $30,662.[5]

To reflect the foregoing and the concessions of the parties,

Decision will be entered

under Rule 155.

---

[5]We have considered all of the contentions and arguments of petitioner that are not addressed herein and find them to be without merit and/or irrelevant.